**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

───────────────────────────

**BOOTH OIL SITE ADMINISTRATIVE GROUP,**

                              **Plaintiff,**

**v.**
                                                    **98-CV-0696A(Sr)**

**SAFETY-KLEEN CORPORATION, et al.,**

                              **Defendants.**

───────────────────────────


**REPORT, RECOMMENDATION AND ORDER**


         This matter was referred to the undersigned by the Hon. Richard J.

Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and

report upon dispositive motions.  Dkt. #120.


         Currently before the Court are the following:

    1.  Motion (Dkt. #162), by Lonsdale Schofield and Schofield
        Oil Limited ("Schofield Oil"), to dismiss the amended
        complaint;

    2.  Motion (Dkt. #165), by Booth Oil Company, Inc. ("Booth Oil"), for partial
        summary judgment dismissing the fifth cause of action seeking an
        accounting;

    3.  Motion (Dkt. ##173 & 179), by Joseph Chalhoub, Breslube Industries
        Limited ("Breslube Industries"), 118958 Canada ("118958 Canada"),
        and Speedy Oil Services, Inc. ("Speedy Oil"), to dismiss and/or for
        summary judgment;

    4.  Motion (Dkt. #175), for summary judgment by Booth Oil Site
        Administrative Group ("plaintiff"), against Booth Oil;

5.  Motion (Dkt. #183),[1] by Ahsen Yelkin and EC Holdings, Inc. ("EC Holdings"), to join in the motions of Joseph Chalhoub and Lonsdale Schofield; and

6.  Motion (Dkt. #189), by plaintiff for summary judgment against George Booth, III; Booth Oil; Joseph Chalhoub; Lonsdale Schofield; EC Holdings; Ahsen Yelkin; and Katherine Street Properties, Inc. ("Katherine Street Properties").

## BACKGROUND

George Booth moved his waste oil business to Robinson Street in North Tonawanda in 1939. Dkt. #175-8, p.6. From approximately 1948 through 1960, George Booth and George Booth, Jr. operated George Booth & Son as a partnership. Dkt. #175-8, p.7. George Booth purchased the property from the Erie Railroad Company on August 12, 1951. Dkt. #175-2, ¶ 12. In early 1960, they incorporated George Booth & Son, Inc., and transferred the property to the corporation. Dkt. #175-2, ¶ 13. George Booth, III, became involved in the business in approximately 1970. Dkt. #175-2, ¶ 14.

The name of the business was changed to Booth Oil on February 1, 1971. Dkt. #175-2, ¶ 13. In addition to the parcel owned by Booth Oil, the Robinson Street facility also consists of a parcel owned by Conrail and leased by Booth Oil ("Conrail parcel"). Dkt. #87, Exh. A, No. 11-13.

In 1978, the New York State Department of Environmental Conservation ("NYSDEC"), investigated sources of waste oil collected by Booth Oil and concluded

---

[1] Ahsen Yelkin and EC Holdings did not file a notice of motion.

that the company had been receiving significant quantities of oil contaminated with PCBs.  Dkt. #175-4, p.7.  The Niagara County Health Department also determined that an oil slick in the Niagara River was caused by Booth Oil discharges to the storm sewer adjacent to the Robinson Street facility.  Dkt. #175-4, p.7.  The matter was referred to the Attorney General of the State of New York in December, 1979.  Dkt. #202-2.

By Order on Consent between Booth Oil and the NYSDEC, Booth Oil agreed to cease all processing operations at the Robinson Street facility and commence operations at a new facility on Katherine Street in the City of Buffalo by January, 1982.  Dkt. #87, ¶ 34; Dkt. #202-2.  The Order on Consent binds Booth Oil to a "Proposal and Schedule" for closure of the site[2] and states that if the terms of that proposal are not met, Booth Oil will be liable for liquidated damages in the sum of $65,000, which is the estimated cost of the proposal.  Dkt. #117, ¶ 7; Dkt. #202-2.  The NYSDEC agreed that "no violation of the Environmental Conservation Law of the State of New York shall be instituted by the Department, its employees, or agents for as long as Booth adheres to and fully complies with the terms and provisions of said Proposal and Schedule."  Dkt. #202-2, p.4.

On January 5, 1983, a fire at the Katherine Street facility shut down operations for approximately seven months.  Dkt. #108, ¶ 4; Dkt. #117, Exh. 6.

---

[2] The "Proposal and Schedule" for the closure of the Robinson Street facility is not incorporated into the record before this Court.

As of February 1, 1983, Booth Oil advised the NYSDEC that in excess of 149,790 gallons of oil-water mix was stored at the Robinson Street facility, excluding Tank #60.  Dkt. #117, Exh. 6.

On February 28, 1983, Booth Oil applied for a Part 360 operating permit to continue use of Tank #60 at Booth Oil's Robinson Street facility.  Dkt. #108, ¶ ¶ 11 & 13.  Booth Oil needed the tank because its Katherine Street facility only had enough storage for two days of operation.  Dkt. #108, ¶ 12.  The application indicates that:

> The Storage Facility operated by [Booth Oil] on Robinson Street utilizes Tank #60 exclusively.  Tank #60 is protected by an earthen berm of compacted soils which surrounds the entire tank providing for spill containment and has a capacity of approximately 280,000 gallons.[3]  The Tank #60 area is underlain with a strata of impermeable clay-type soils as a sub-base to prevent any vertical migration of contaminants. Additionally, the interior of the bermed area surrounding Tank #60 has been regraded to drain any spilled materials into the sump.  The sump is to be equipped with a "Filter Scavenger" device which will provide for effective oil-water separation and the retrieval of any spilled hydrocarbons with the remaining water being discharged to the sewer.  Should any leak develop beneath the tank, the material in all likelihood will find its way to the sump and be processed by the "Filter Scavenger".  Tank #60 is a 500,000 gallon tank constructed of carbon steel which is approximately 50' in diameter and is used to store industrial and crankcase oils for subsequent processing at the Katherine Street Facility owned and operated by Booth Oil Co., Inc.  At no time will a level of more than 20' be maintained in Tank #60 (see Appendix VI).

Dkt. #108, Exh. 6.  The application also indicates, and the permit required, that "[m]anifests for all manifested loads of crankcase and industrial oils off-loaded to Tank

---

[3]  The capacity of Tank #60 is not referenced consistently throughout the record.

#60 will be kept at the Katherine Street Facility" and that the "operating record of the Katherine Street Facility will reflect all movements into and out of Tank #60."  Dkt. #108, Exh. 6 & 9.

On March 4, 1983, the NYSDEC inspected Booth Oil's Robinson Street facility and noted that all processing equipment had been removed and that Tank #60 was the only tank which remained in operation.  Dkt. #108, ¶ 12 & Exh. 7.

On June 28, 1983, Lonsdale Schofield gave George Booth, Jr. 200,000 gallons of used oil which Schofield Oil had in storage in Toronto, Ontario in exchange for 15% of the outstanding common stock of Booth Oil.  Dkt. #87, Exh. 2, ¶¶ 6-7; Dkt. #108, ¶ 3; Dkt. #114, Exh. A.  Lonsdale Schofield affirms that this oil was delivered, in truck loads of approximately 7,000 gallons, to Booth Oil's Katherine Street facility in Buffalo.  Dkt. #87, Exh. 2, ¶ 8.  Lonsdale Schofield affirms that none of the oil was delivered to the Robinson Street facility in North Tonawanda.  Dkt. #87, Exh. 2, ¶ 9.  In support of this assertion, Lonsdale Schofield submitted the agreement stating that the "[o]il will be delivered to Booth Oil f.o.b. at its plant in Buffalo, New York," as well as accounts receivable indicating multiple deliveries to Katherine Street between June 23, 1983 and August 29, 1983.  Dkt. #114, Exh. A & B.   Lonsdale Schofield also affirms that, because of testing requirements in Ontario, the oil delivered to the Katherine Street facility must have contained less than 5 ppm PCBs.  Dkt. #87, Exh. 2, ¶ 16.

On August 11, 1983, Booth Oil obtained a Part 360 permit to operate Tank #60 at Booth Oil's Robinson Street facility.  Dkt. #108, ¶ 53.

On September 26, 1983, Schofield Oil, through its wholly owned subsidiary L&R Schofield Holdings, Inc., sold its operating assets to Breslube Enterprises in exchange for a 49% limited partnership interest in Breslube Enterprises. Dkt. #108, ¶ 5.  This sale included inventory of 196,000 gallons of used oil.  Dkt. #108, ¶ 6.  As the sole general partner of Breslube Enterprises, Breslube Industries is liable for the debts of Breslube Enterprises.  Dkt. #108, ¶ 2.

George Booth, III testified at his deposition that the Robinson Street site was a destination for pick-ups of used oil in 1983.  Dkt. #108, Exh. 2, p.59.  Records suggest delivery of oil to Tank #60 during February and March of 1983.  Dkt. #117, Exh. 13.  Records also suggest that Breslube Industries (a.k.a. CanAm), was delivering oil to Booth Oil during this time frame.  Dkt. #117, Exh. 13; Dkt. #189-5.

Booth Oil advised the NYSDEC that "[t]here have not been any in-going or out-going shipments for the Tank #60 facility during the quarterly time period of October 1 – December 31, 1983."  Dkt. #117, Exh. 5. Quarterly reports for Tank #60 indicate that no shipments were received between January 1, 1984 and September 30, 1984. Dkt. #189-4.  During this same time period, oil was being removed from Tank #60, resulting in a drop in the level of oil contained within the tank from 16 feet to four feet, two inches.  Dkt. #189-4.

As of June 18, 1984, Booth Oil advised NYSDEC that approximately 466,610 gallons of oil-water mix was stored at the Robinson Street facility, including

Tank #60.  Dkt. #117, Exh. 7.  Booth Oil further advised that

> Since the 6/84 inventory was taken, approximately
> 14,000 gallons have been removed from 60 tank.
>
> Presently we are planning to remove two loads of liquid
> (14,000 gallons) every week until we remove all the liquid.
> Based on the above numbers, it will take 32 weeks to empty
> the site.  Therefore, we are requesting until March, 1985 for
> completely emptying the tanks.

Dkt. #117, Exh. 7.


On August 17, 1984, NYSDEC inspectors observed five underground

storage tanks at the Robinson Street facility and determined that they were

contaminated with PCBs.  Dkt. #108, ¶ 26; Dkt. #175-2, ¶ 19.  The NYSDEC also noted

pools of oil sitting along the railroad tracks and concerns with the operation of oil

recovery wells on the property.  Dkt. #175-15.


Booth Oil Company was insolvent on September 14, 1984, when 118958

Canada purchased 35% of the common stock of Booth Oil from George Booth, III.  Dkt.

#87, ¶ ¶ 3, 55.  118958 Canada was a 50% owned subsidiary of Breslube Enterprises

at that time.  Dkt. #87, ¶ 4.  Breslube Industries owned a  22.7% interest in Breslube

Enterprises.  Dkt. #87, ¶ 5.  Joseph Chalhoub owned 100% of the outstanding shares

of Breslube Industries.  Dkt. #87, ¶ 6.  Schofield Oil, the sole parent company of L&R

Schofield Holdings, Inc., which was a 49% limited partner of Breslube Enterprises,

owned 15% of Booth Oil.  Dkt. #108, ¶ 18.  Breslube Enterprises had an option to

purchase the 15% of Booth Oil which was owned by Schofield Oil and had a voting trust

agreement pursuant to which it held those shares as voting trustee.  Dkt. #108, ¶ 18.

George Booth, III held 46.25% and G&H Oil held 3.75% of the remaining shares of
Booth Oil  Dkt. #108, ¶ 19.  Breslube Industries also held a 1% voting trust in the shares
of George Booth, III.  Dkt. #108, ¶ 20.  As a result, Joseph Chalhoub had 51% voting
control of Booth Oil (35% of 118958 Canada; 15% of Schofield Oil; and 1% of George
Booth, III).   Dkt. #108, ¶ 22.  Joseph Chalhoub also owned an option to purchase an
additional 35% of Booth Oil from George Booth, III.  Dkt. #108, ¶ 23.

George Booth, III testified at his deposition that Booth Oil hired David
Peel[4] at Joseph Chalhoub's suggestion during the winter of 1985.  Dkt. #108, Exh. 2,
p.113.  George Booth, III testified that David Peel ran Booth Oil, including the Robinson
Street site.  Dkt. #108, Exh. 2, p.114.  When asked if David Peel reported to Mr.
Chalhoub, Mr. Booth replied, "[i]ndirectly."  Dkt. #108, Exh. 2, p.114.  However, Mr.
Booth testified that Mr. Peel was reporting the day-to-day operations of Booth Oil,
especially with respect to Robinson Street, to Mr. Chalhoub, although he could not say
with what level of detail.  Dkt. #108, Exh. 2, pp.137, 139 & 162.

On June 6, 1985, Booth Oil filed for bankruptcy pursuant to section 1107
of the bankruptcy code.  Dkt. #108, ¶ 57.

By letter dated February 25, 1986, on Breslube Group letterhead, David
Peel, Director of Operations for Breslube Enterprises, advised the NYSDEC of its
"intention to reorganize the Booth Oil Facility at Katherine Street . . . under a new

---

[4] Plaintiff notes that Mr. Peel has not yet been deposed.  Dkt. #108, ¶ 28.

corporation which will be under the direct control and management of Breslube Enterprises."  Dkt. #108, Exh. 16.

According to NYSDEC notes, Mr. Peel advised the NYSDEC by telephone on May 21, 1986 that "Breslube does not have $20,000" to dispose of the PCB contaminated fuel oil.  Dkt. #108, Exh. 17.  Mr. Peel suggested transferring the fuel to a dedicated tank at the Katherine Street facility as a temporary solution, but NYSDEC refused.  Dkt. #108, Exh. 17.  By letter dated July 24, 1986 to David Peel, Director of Operations for Booth Oil, NYSDEC advised that the tank containing the PCB contaminated fuel oil had to be disposed of before water from remaining tanks could be removed.  Dkt. #108, Exh. 18.

By letter dated June 12, 1986, counsel for the New York State Department of Law advised Joseph Chalhoub that the NYSDEC

> has informed me that Breslube has taken over operation and management of the Booth Oil facility.  I also understand that Breslube owns a majority of the stock in Booth Oil.
>
> Pursuant to a judicial consent order in the above-referenced matter, Booth Oil agreed to make certain changes in its facility and operations and, in addition, agreed to pay a penalty to the State of New York, now in the amount of $4,000 (U.S.).  I understand that you committed to make this payment in a meeting . . . prior to Booth Oil seeking protection from the Bankruptcy Court.  However, despite your representations to [NYSDEC], this penalty has not been paid.

Dkt. #117, Exh. 2.  A NYSDEC memo dated August 8, 1986 sets forth the following chronology of events at the Robinson Street facility:

-9-

Booth Oil processed and stored waste petroleum oils at the Robinson Street Site in North Tonawanda for 50+ years. The operation was very sloppy and oil was spilled all over the site, saturating the ground.  The steam stripping unit and an acid treatment process storage tank vents created irritating odor problems.

In the early 80's, Booth was being pushed by the Niagara County Health Department and the Department of Environmental Conservation [sic] act and they decided to shut down the Robinson Street site and install a new facility on Katherine Street in Buffalo.

The need for permitting the new facility was leverage enough to prompt Booth to prepare a closure plan for the Robinson Street site.

This plan (1981) included the installation of two drawdown wells to remove underground layers of oil for processing off-site.  The closure plan also included the cleaning and removal of the storage tanks on the site.

Thousands of gallons of oil were pumped out and taken to the Katherine Street facility for processing.  However, as late as June, 1984, there were still 45+ tanks containing waste oil and oily water on the Robinson Street site.

In August, 1984, a DEC inspection found an underground tank on the west portion of the site (owned by Conrail – leased to Booth).  Booth claimed that they had no records or knowledge of this tank.  A sampling of the tank and surrounding soil showed PCB's.  The tank contents showed PCB's in excess of 50 ppm.

In early 1985, [Breslube] Enterprises – Breslau, Ontario was found to have an interest in Booth Oil Company.  The [Breslube] people, pressured by DEC, got going in June, 1985, removing oil from the storage tanks.  They sampled the sludge in the bottom of the tanks and found no contaminants.  The sludge was removed from the site.

All the above ground tanks have been removed from the site except Tank #60 which is the largest (225,000 gallons).  This tank has been cleaned and is to be cut up and relocated to another site.

-10-

At DEC request, nine test pits were dug on the site and soil samples taken at 2:0 intervals.  Verbal results of analysis show that where PCB's were found, the PCB contamination did not exceed the EPA 50 ppm limit (environmental concern).

In May of this year, former employees informed us that there were more tanks buried on the adjacent Conrail property.  A careful investigation located six buried tanks.  Five contained water with a little oil slick.  One was found to contain diesel oil contaminated with PCB's above 50 ppm.

Booth was advised of disposal procedures and is obtaining quotes from SCA and two others for removal and incineration of the contaminated diesel oil and for the triple cleaning of the tank.

When this tank is clean, the other five will be pumped out and all six tanks will be removed.

* * *

The test pits showed that there is still a considerable amount of oil three to six feet down all over this site.  We are waiting for copies of the test pit soil analysis to determine what is to be done before Booth Oil can walk away from the site.

Dkt. #108, Exh. 19.

On August 28, 1986, Joseph Chalhoub, as President of Breslube Enterprises, by its Sole General Partner, Breslube Industries, identified George Booth, III, President and Joseph Chalhoub, Treasurer as responsible corporate officers of Booth Oil and identified Joseph Chalhoub, President, as well as two other individuals as responsible corporate officers of Breslube USA.  Dkt. #117, Exh. 3.  Mr. Chalhoub also identified the following officials as duly authorized representatives of Breslube USA/Booth Oil:

Dave Peel, Director of Operations;

-11-

Ahsen Yelkin, General Manager, Manufacturing; and

Gary Farrar, General Manager, Supply

Dkt. #117, Exh. 3.  The certification notes that Breslube Enterprises "has controlling

interest in Booth Oil and BresLube [sic] USA."  Dkt. #117, Exh. 3.


By letter dated September 16, 1986, on Breslube letterhead, Mr. Peel

advised Conrail that:

> We are in the process of cleaning up the site of our old
> operations at Robinson Street, North Tonawanda.  One of
> the remaining items of work still to be done is to clean out six
> underground tanks located as shown on the attached
> sketch.
>
> * * *
>
> There is no evidence that these tanks in fact belong to Booth
> Oil, although we understand that they were used by Booth.
> On this basis we have elected to dispose of the contents of
> these tanks.  However, in view of the facts [sic] that the land
> belongs to Conrail, and possibly the tanks, the proximity of
> the tanks to the railway and Booth's Chapter [11] status, you
> may wish to assist with the excavation and backfill in order
> to avoid potential problems or future liabilities.

Dkt. #108, Exh. 22.  Joseph Chalhoub was copied on this letter.  Dkt. #108, Exh. 22.


Mr. Peel and the NYSDEC exchanged correspondence regarding the

removal of the underground storage tanks from the property, resulting in removal of the

PCB contaminated material from T-5 on September 18, 1986, with Ahsen Yelkin,

Manager of Manufacturing, Breslube Enterprises, present on behalf of Booth Oil.  Dkt.

#108, Exh. 18-23.   Ahsen Yelkin testified Joseph Chalhoub was his boss, that Mr.

-12-

Chalhoub directed his work, and that he spoke to Mr. Chalhoub every day.  Dkt. #108,

Exh. 29, pp.40, 63, 66.  He denied taking orders from George Booth, III.  Dkt. #108,

Exh. 29, p.63.


On May 29, 1987, Safety Kleen Corporation purchased the assets of

Breslube Enterprises for consideration of approximately $10 million, largely comprising

Safety Kleen stock.  Dkt. #108, ¶ 50.  Joseph Chalhoub received slightly more than

50% of the stock and Lonsdale Schofield received slightly less than 50% of the stock.

Dkt. #108, ¶ 51.  Breslube Enterprises and Breslube, Inc. were dissolved and their

liabilities were transferred to the general partners , including Breslube Industries.  Dkt.

#108, ¶ 61.


By letter dated June 2, 1987, on Booth Oil letterhead, Derek Wilkinson,

Environmental Engineer for the Breslube Group, provided the NYSDEC a "closure plan

for Tank 60 at our former site located at 76 Robinson Street in North Tonawanda."  Dkt.

#108, Exh. 24.  The closure plan indicated that Tank 60 was the only remaining tank at

the site and noted that "[n]o waste or waste handling equipment remains at the site, and

no operations are being carried out there."  Dkt. #108, Exh. 24.  The letter was copied

to Ahsen Yelkin.  Dkt. #108, Exh. 24.  The tank was removed on October 12, 1987.

Dkt. #108, Exh. 27.


By letter dated October 1, 1987, NYSDEC advised Booth Oil that

As you know, this Department has been investigating the
repeated discharge of oil into the Niagara River from the

Robinson Street storm sewer.  On Tuesday, September 29, 1987, [George Booth, III] accompanied me on a site inspection of the storm sewer.  At that time, we discovered the presence of oil in a catch basin and manhole adjacent to your property and near draw down well number two.  No other catch basin or manhole had any evidence of oil being present.  The ground surface around this catch basin had no signs of any spillage nearby that would explain the presence of oil.

Based on the information obtained from sampling data and physical field evidence, it is the determination of this Department that your property is the source of the oil discharge into the Niagara River.  As such, your company is responsible for the proper containment, cleanup and removal of the oil and the reimbursement of the oil spill contingency fund for the monies expended to date on the investigation of the incident.

Dkt. #117, Exh. 16.

By letter dated September 30, 1987, Derek Wilkinson, Environmental Engineer for the Breslube Group, informed the NYSDEC that they had contracted for the dismantling of Tank #60.  Dkt. #108, Exh. 26.

On December 11, 1987, the Robinson Street facility was referred to NYSDEC for issuance of a demand letter for a Remedial Investigation/Feasibility Study ("RI/FS"), based on the following:

On June 22, 1987, during a period of very heavy rainfall . . . a sample of oily scum was taken by NYSDEC from the oil boom located at the discharge of the Robinson Street Sewer into the Niagara River.  This sample showed a PCB content of 379 ppm.  In September 1987, during a less intense rainfall, more oily scum was collected by the boom.  This too analyzed over 50 ppm PCBs.

> The Robinson Street Sewer starts in front of the Booth Oil property.  Catch basins receive runoff from Booth Oil, Robinson Street and the railroad crossings.  There is no other source of oil or oily waste.
>
> The oil boom was installed and is maintained by Booth Oil under Consent Order 82-10 (prompted by oil spills to the Niagara River in the early 80's). . . .
>
> Responsible parties would be Booth Oil as owner and operator, Conrail as owner and several generators listed on the attached page from the Right-to-Know listing (1985).

Dkt. #108, Exh. 27.

The summary of a January 15, 1988 meeting with Joseph Chalhoub, Ahsen Yelkin and NYSDEC representatives, *inter alia*, indicates that the NYSDEC

> opened the meeting by stating the Katherine Street operation, regardless of Chapter 11 bankruptcy and ownership uncertainties, must promptly meet both Part 370 series Regulation and all Consent Order requirements. Recurring consent order violations, delays in responding to Part 373 Application NOD's and Insurance/Assurance requirements were defined. [NYSDEC] also asked for an answer to our September 1, 1987 letter requesting owner/operator relationships for the site.
>
> Mr. Chalhoub generally described some of the relationships between Safety Kleen/Breslube/Booth.  These appear to be still evolving and some of the relationships were not precisely defined.

Dkt. #108, Exh. 11.   As of January 15, 1988, George Booth, III owned 46.25% of the stock of  Booth Oil; 118958 Canada Ltd owned 35%; Schofield Oil, Ltd. owned 15%; and G&H Oil Co. owned 3.75%.  Dkt. #87, Exh. B.  The NYSDEC notes consider Breslube and Safety Kleen "the site operators."  Dkt. #108, Exh. 11.

-15-

By letter dated February 18, 1988, the NYSDEC informed Booth Oil that its Robinson Street facility "constitutes a significant threat to the environment" and that it had documented a release or threatened release of hazardous substances from the site.  Dkt. #194-2, p.2.

In a memorandum dated June 7, 1988, the NYSDEC documented closure of Tank 60, stating:

> Tank 60 was separately permitted under Part 360 Permit 3425 on August 11, 1983.  This waste oil storage tank was located within an earth containment dike in the midst of other uncontained operational and storage units at this Booth Oil rerefining site.
>
> The overall site is contaminated with waste oil.  Some evidence of PCB contamination exists.  The overall site closure is being handled by the Inactive Site Group and has been referred to DEE for PRP identification.
>
> This letter documents formal closure of VT-60 but not of the overall site.  In summary, Tank 60 was drained, residue tested and found to be nonhazardous.  Tank was then cleaned, removed in pieces and scrapped.  Soil samples were taken and analyzed beneath and adjacent to the tank within the dike area.  Analysis confirmed the visual indication that waste oil contamination was present at the south end within the dike . . . .  Approximately 187 tons of soil were removed and the contaminated area resampled and analyzed.  Oil and grease levels were reduced to a level of 11.6 ppm from a previous 13,000 ppm.  An independent professional engineer registered in New York State certified the closure . . . .
>
> I believe that there is little risk in accepting closure of this separately permitted tank.  Overall site contamination is being handled by a separate action, and extensive inactive site remediation will probably be required.

Dkt. #87, Exh. C.   By letter dated July 19, 1988, NYSDEC advised Booth Oil that:

> This letter is to confirm the receipt of owner/operator and independent professional engineer's certification . . . of RCRA closure for this facility [VT-60 Tank].  We now consider this facility officially closed.  Your authority to operate as a Treatment, Storage, and Disposal Facility (TSDF) is terminated.
>
> Please be advised that the United States Environmental Protection Agency has determined that the corrective action provisions of the Hazardous and Solid Waste Amendments (HSWA) Section 3800(h) apply to all TSDF's which have acquired interim status.
>
> Your waste facility is presently undergoing corrective action under the direction of the Department's Buffalo Division of Remediation.  Once the corrective action provisions of HSWA have been met by the facility, the facility can have their interim status terminated.

Dkt. #117, Exh. 15.

On July 5, 1989, Booth Oil filed a Debtor's Liquidating Plan of Reorganization, with Disclosure Statement.  Dkt. #108, ¶ 63.  This plan, as amended on September 29, 1989, proposed that Speedy Oil would purchase the assets of Booth Oil for $1,000,000, which would be used to satisfy priority claims with the remainder, in addition to any other surplus, going into a contingency fund for environmental and other administrative creditors.   Dkt. #108, ¶¶ 66-67 & Exh. 32.  Specifically, the Plan provides that:

> Booth will collect in the normal course of business and apply the funds collected to liabilities such as administrative expenses, post-petition accounts payable, taxes, payroll, etc.  Surplus, if any, will be maintained as a contingency for certain other liabilities which will be explained below in this Disclosure statement.

Dkt. #186-3, p.25.  The Plan is clear that

> The holders of issued and outstanding equity shares of
> Booth will receive no distribution under the Plan.  The equity
> shares of Booth will be cancelled under the Plan and the
> Company dissolved.

Dkt. #108, ¶ 68.

On July 13, 1989, George Booth, III moved the bankruptcy court for approval for Booth Oil to enter into a contract with Ahsen Yelkin.  Dkt. #108, Exh. 35.  In support of that motion, Ahsen Yelkin affirmed that he was an employee of Speedy Oil between April 1986 and June 1987 and an employee of Safety Kleen Oil Services, Inc. ("Safety Kleen"), since June of 1987.  Dkt. #108, Exh. 35.  The bankruptcy court advised Booth Oil Company that "such an order is unnecessary" because "a mere employment contract . . . requires no court approval."  Dkt. #108, Exh. 35.

The Debtor's Liquidating Plan of Reorganization was confirmed by the bankruptcy court on December 28, 1989.   Dkt. #108, ¶ 69; Dkt. #189-11.

In 1990, the NYSDEC initiated an RI/FS to assess the nature and extent of contamination at the site.  Dkt. #175-4, p.8.

In early 1991, the NYSDEC commenced an investigation into alleged storage of PCB contaminated waste at Booth Oil's Katherine Street facility and allegations that Safety-Kleen was "cocktailing" PCB oil, *i.e.*, mixing oil containing more than 50 ppm PCBs with oil with no or lower concentrations of PCBs so that the resulting

mixture contained less than 50 ppm PCBs and therefore, was not required to be handled as waste.  Dkt. #108, ¶¶ 81-82.

On December 20, 1991, Booth Oil loaned Ahsen Yelkin $80,000 at 6% interest.  Dkt. #108, ¶ 73.  Ahsen Yelkin used $75,000 of that money to purchase a mortgage on George Booth, III's residence in Williamsville, New York.  Dkt. #223, ¶ 5.

EC Holdings was incorporated on April 10, 1992, with Ahsen Yelkin as the sole shareholder and President.  Dkt. #223, ¶ ¶ 10-11.  George Booth, III testified at his deposition that EC Holdings was a corporation that Ahsen and he had setup to finance a new business on the East coast that was going to be in the waste water management business.  Dkt. #108, Exh. 2, p.277.

On August 3, 1992, Booth Oil loaned EC Holdings $300,000 at 4.84% interest.  Dkt. #108, ¶ 75.  The promissory note is signed by Ahsen Yelkin, as president of EC Holdings.  Dkt. #108, ¶ 75.

On October 28, 1992, Speedy Oil purchased the real estate and fixtures of the Katherine Street facility for $1 million.  Dkt. #87, ¶ 66; Dkt. #175-2, ¶ 49. Thereafter, Speedy Oil leased the real estate and fixtures to Booth Oil at a rent of $50,000 per month.  Dkt. #87, ¶ 67; Dkt. #204-2, ¶ 50.  Speedy Oil applied to the NYSDEC for transfer of the Booth Oil Part 350 Permit to operate the Katherine Street facility, but the application was never acted upon.  Dkt. #87, ¶ 68.  Because the permit

was not transferred, Booth Oil continued to reprocess oil on behalf of Safety Kleen

Corp.  Dkt. #175-2, ¶ 50.  However, Joseph Chalhoub affirms that neither he, Breslube

Industries or Speedy Oil "continued the enterprise of Booth Oil."  Dkt. #87, ¶ 69.  Safety

Kleen paid Booth Oil approximately $3.3 million for oil processing services in 1992 and

approximately $4 million for oil processing services in 1993.  Dkt. #175-2, ¶ 50.


On December 18, 1992, George Booth, III, Joseph Chalhoub (on behalf of

118958 Ontario), and Lonsdale Schofield (on behalf of Schofield Oil), as the majority

shareholders of Booth Oil, agreed in principle that a special fund be set up in the

amount of $500,000 for the purpose of payment of any future claims or potential

liabilities against Booth, and the associated legal fees that may result.  Dkt. #175-36.


In its annual report, distributed to shareholders on March 31, 1993,

Safety-Kleen Corporation disclosed that

> In 1987, the Company purchased its oil processing business
> from enterprises controlled by Joseph Chalhoub.  Mr.
> Chalhoub is now a Senior Vice President of the Company
> and supervises the Company's oil reprocessing business.
> Mr. Chalhoub owns a 15% interest in Booth Oil Corporation
> ("Booth").  Booth is the operator of an oil reprocessing plant
> in Buffalo, New York. . . . The Company did not attempt to
> acquire the Buffalo plant at the time of the initial acquisition
> because Booth was in the process of a reorganization under
> Chapter 11 of the Bankruptcy Act and because the
> Company desired that certain environmental clean up work
> be done before it acquired the Plant.  Speedy Oil
> Corporation (a company in which Mr. Chalhoub owns a 45%
> interest) ("SOC") acquired the right to purchase the Buffalo
> Plant out of the Chapter 11 proceeding for $1 million and
> made approximately $900,000 in capital improvements at
> the Plant.  SOC charged Booth $7,500 per month for use of

the capital improvements pending SOC's purchase of the
Plant.  The purchase was consummated on or about
November 1, 1992, and thereafter, SOC leased the Plant
(including the improvements made to it by SOC) back to
Booth at a rental of $50,000 per month.  In 1990 SOC
granted the Company an option to purchase the Buffalo
Plant from SOC for a price equal to SOC's investment in the
Plant plus interest on the investment at 12% per annum.
The Company anticipates that upon obtaining the necessary
environmental operating permits, it will exercise the option
and directly operate the plant and the leaseback of the Plant
to Booth will end.  In 1993 the Company paid Booth
approximately $4.0 million for processing services at the
Plant.  The Company believes that the prices it pays for
processing services at the Buffalo Plant are competitive with
the prices it would be required to pay at other third party
facilities.

Dkt. #175-26, p.5.

On April 1, 1993, EC Holdings loaned Ahsen Yelkin $50,000.  Dkt. #223,

¶ 14.  On April 22, 1993, Booth Oil loaned EC Holdings $150,000 at the applicable

federal rate per annum.  Dkt. #108, ¶ 76.  The promissory note is signed by Ahsen

Yelkin.  Dkt. #108, ¶ 76.  Subsequently, EC Holdings loaned Ahsen Yelkin another

$50,000.  Dkt. #223, ¶ 14.  George Booth, III testified at his deposition that Joseph

Chalhoub had approved the loans to EC Holdings.  Dkt. #108, Exh. 2, pp.277-78.

Joseph Chalhoub testified that he did not discover these loans until approximately

October, 1994; that he believed these payments were improper; but he did not attempt

to recoup them.  Dkt. #108, Exh.2, pp.132-35; Dkt. #213, ¶ 10.  None of the payments

were disclosed in status reports to the bankruptcy court.  Dkt. #175-2, ¶ 64; Dkt. #228,

¶ 58.

On May 21, 1993, the bankruptcy court issued a final decree.  Dkt. #108, ¶ 77; Dkt. #186-3, p.41.  Booth Oil indicated to the court that equity holders "received nothing under the Plan as stockholders."  Dkt. #108, Exh. 43; Dkt. #186-3, p.46.  Booth noted that:

> The Amended Disclosure Statement and Plan of Reorganization contemplated the establishment of a contingency fund for class 4 (environmental) claimants.  This fund is in the process of being set up.  The amount of such a fund is dependent upon pension and other liabilities being fully identified and resolved.

Dkt. #186-3, p.46.  Booth also explained that:

> As noted, the Plan called for the Operating Assets, as defined in the Plan, to be purchased by Speedy for $1,000,000.  Speedy conditioned the purchase upon the satisfaction of several conditions set forth in pages 9 through 10 of the Disclosure Statement.  All of these conditions have been satisfied, except for the approval by the New York State Department of Environmental Conservation of a transfer of Part 373 Permit of Booth to Speedy.  Notwithstanding the foregoing condition, on October 28, 1992, Speedy purchased the Operating Assets for the consideration described in the Plan.  As described in the Amended Disclosure Statement, significant capital expenditures were made and paid for by Speedy necessary to satisfy New York State Department of Environmental Conservation mandates ("Speedy Improvements").  If the Speedy Improvements were not made, Booth would not have been permitted to operate.  Booth was obligated to make payments to Speedy for use of the Speedy Improvements prior to October, 1992.  After October, 1992, Booth may continue in operation until regulatory approval of the permit transfer, a date for which has not been established by the regulatory bodies.  Pending approval of the permit transfer, Booth will be required to make payments to Speedy for the lease of the Katherine Street premises.  Upon permit transfer and payment of the pension liabilities described in Item VI, a Final Report will be submitted and a motion for final decree closing the case will be made by Booth.

Dkt. #108, Exh. 43; Dkt. #186-3, p.47.  Thus, due to difficulties in obtaining approval

from the NYSDEC for the transfer of Booth Oil's operating permit to Speedy Oil, Booth

Oil continued operations with the permit as its sole asset.  Dkt. #108, ¶ 80.

On August 15, 1994, Booth Oil issued a check to Katherine Street

Properties for $300,000.  Dkt. #175-2, ¶ 52; Dkt. #228, ¶ 63.  The check is authorized

by George Booth, III and Mary Brandys and endorsed by George Booth, III, president of

Katherine Street Properties.  Dkt. #175-2, ¶ 52; Dkt. #228, ¶ 64.

On August 18, 1994, at a special meeting of the Board of Directors, which

included Joseph Chalhoub and Lonsdale Schofield, but excluded George Booth, III,

Booth Oil accepted a plea agreement with respect to the NYSDEC investigation, which

required Booth Oil to plead guilty to a state felony count of unlawful possession of

hazardous waste and pay a criminal fine of $100,000 to New York while Safety Kleen

agreed to forfeit $1.9 million to the federal government but was absolved of criminal

responsibility.  Dkt. #108, ¶ ¶ 83, 85.  Because the felony conviction rendered Booth Oil

ineligible to retain its waste permit and because the plea agreement called for the

current management of Booth Oil's Katherine Street facility to be removed within 15

days of the date of the plea, George Booth, III commenced state court proceedings

challenging the board resolution accepting the plea.  Dkt. #108, ¶¶ 84, 86.  The state

court accepted the plea without prejudice to George Booth, III's challenge to the validity

of the corporate resolution authorizing the plea.  Dkt. #108, ¶ 86.

On August 19, 1994, Joseph Chalhoub sent revised banking resolutions, adopted at the August 18th Board of Directors' meeting, to M&T Bank requiring that checks in circulation be authorized by Joseph Chalhoub or Lonsdale Schofield and that all future checks be signed by either Joseph Chalhoub as Treasurer or Susan Tunstall as Accountant.  Dkt. #108, ¶ 86.

By agreement signed October 7, 1994, George Booth, III, discontinued the litigation and approved the Board of Directors' Resolution authorizing the plea agreement, then resigned as an employee, officer and director of Booth Oil and surrendered his stock certificates in return for $275,000 from Booth Oil, assignment of the promissory note evidencing the $80,000 loan to Ahsen Yelkin, and a consulting agreement with Safety Kleen.   Dkt. #108, ¶ 88; Dkt. #189-7.  Joseph Chalhoub declares that this payment was for settlement of the lawsuit, not redemption of the stock.  Dkt. #213, ¶¶ 18-19.  The consulting agreement provided that Safety Kleen would pay George Booth, III $400,000 in return for his cooperation with Safety Kleen's ongoing efforts to secure the permit for the facility.  Dkt. #108, ¶ 89.

In separate agreements, Safety Kleen paid Speedy Oil $2.4 million for the land at Katherine Street facility and the operating assets originally held by Booth Oil. Dkt. #108, ¶ 92.  Safety Kleen used employees of Booth Oil to operate the Katherine Street facility until some time in 1996, when the employees became Safety Kleen employees.  Dkt. #87, Exh. A, No. 84-88.

On June 28, 1996, the NYSDEC approved transfer of the permit to operate the Katherine Street facility from Booth Oil to Safety Kleen.  Dkt. #189-8; Dkt. #204-2, ¶ 51.

Joseph Chalhoub sold his Safety Kleen stock in 1998 for more than $6 million.  Dkt. #108, ¶ 52.

The NYSDEC's Amended Record of Decision, dated August, 2002, sets forth the remedial plan for the site and estimates an implementation cost of $6 million. Dkt. #175-4, p.15.

As of December 31, 2002, EC Holdings noted a liability of $450,000 plus $220,378 in accrued interest due Booth Oil.  Dkt. #223, ¶¶ 17-23.  EC Holdings dissolved on November 30, 2003, with Ahsen Yelkin assuming obligations of $641,635 to Booth Oil.  Dkt. #223, ¶ ¶ 24-28.

On June 23, 2003, Conrail, Daimler Chrysler Corporation, Ford Motor Company, General Electric Company, General Motors Corporation, New York State Electric & Gas Corporation, Niagara Mohawk Power Corporation, and VIACOM, Inc., signed an Order on Consent with the NYSDEC.  Dkt. #242-2, p.104.  The Order on Consent is issued pursuant to the NYSDEC's authority under New York's Environmental Conservation Law.  Dkt. #242-2, p.104.  The Order on Consent obligates these corporations  to remediate the site and provides that:

If, after review, the [NYSDEC] accepts and approves the
engineer's certification that construction of the remedial
program was completed in accordance with the Approved
Remedial Design, then, unless a supplementary remedial
program is required . . . such acceptance shall constitute a
release for each and every claim, demand, remedy or action
whatsoever against [plaintiff], their respective directors,
officers, employees, and their parents, affiliates,
predecessors, successors and assigns who are not
otherwise responsible parties which the [NYSDEC] has or
may have pursuant to Article 27, Title 13 of the ECL or
pursuant to the Comprehensive Environmental Response,
Compensation and Liability Act (42 U.S.C. § 9601, et seq.),
relative to or arising from the disposal of hazardous waste or
substances at the Site and except as specified herein,
[plaintiff's] obligations pursuant to this Order shall be
deemed satisfied and terminated; provided, however, that
the [NYSDEC] specifically reserves all of its rights
concerning, and such release and satisfaction shall not
extend to claims for natural resources damages nor to any
investigation or remediation the [NYSDEC] deems
necessary due to environmental conditions on-Site or off-
Site which are related to the disposal of wastes at the Site
which indicate that the Approved Remedial Program is not
sufficiently protective of human health or the environment.

Dkt. #242-2, p.111.

On or about March 8, 2004, additional underground storage tanks and soil

contaminated with gasoline were discovered on the site and removed by plaintiff.  Dkt.

#204-2, ¶¶ 19-21.

As of July 29, 2004, plaintiff affirms that it has expended $5,056,907.45 to

clean up the property.  Dkt. #175-40, ¶ 4.  Plaintiff expects to expend a minimum of

$597,230.96 in future costs.  Dkt. #175-40, ¶ 12.  Plaintiff has recovered approximately

$1,312,888.98 in third party settlements and expects to recover an additional

$26,938.00 from another settling party.  Dkt. #175-40, ¶ 13.

Booth Oil has informed plaintiff that it has approximately $450,000 available to pay its creditors.  Dkt. #175-2, ¶ 42.  Plaintiff contends that if Booth Oil had not made improper disbursements to and for the benefit of George Booth, III and his business partner, Ahsen Yelkin, there would be an additional $1,025,000 available in the contingency fund.  Dkt. #175-2, ¶ 65.

## DISCUSSION AND ANALYSIS

**Capacity to Sue**

As an initial matter, defendants challenge the ability of an unincorporated association to commence this action.  Dkt. #174, p.4.  Defendants also complain that plaintiff failed to file a certificate of designation.  Dkt. #174, p.4.

Plaintiff responds that it has the capacity to commence this action pursuant to Fed. R. Civ. P. 17(b) and New York General Associations Law § 12.  Dkt. #190, p.5.  Plaintiff also argues that a certificate of designation is not applicable.  Dkt. #190, p.7.  Finally, plaintiff asserts that defendants have waived this argument by failing to raise it as an affirmative defense in their answers, as required by Rule 9(a) of the Federal Rules of Civil Procedure.  Dkt. #260, p.18.

Rule 9(a) provides that

It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party, except to the extent required to show the jurisdiction of the

court.  When a party desires to raise an issue as to the legal
existence of any party or the capacity of any party to sue or
be sued or the authority of a party to sue or be sued in a
representative capacity, the party desiring to raise the issue
shall do so by specific negative averment, which shall
include such supporting particulars as are peculiarly within
the pleader's knowledge.

In the instant case, plaintiff's complaint and first amended complaint describe plaintiff

as "an unincorporated association of corporations."  Dkt. #1, ¶ 5; Dkt. #129, ¶ 12.  Both

the complaint and the first amended complaint identify the individual members of the

group.  Dkt. #1, ¶ 5; Dkt. #129, ¶ 20.  Defendants did not raise plaintiff's capacity to sue

as an affirmative defense in their answers to the complaint; in opposition to plaintiff's

motion to amend the complaint; or as an affirmative defense in their answers to the first

amended complaint.  Accordingly, this issue is waived.  *See E.R. Squibb & Sons, Inc. v.*

*Accident & Casualty Ins. Co.*, 160 F.3d 925, 936 (2d Cir. 1998) ("Lack of capacity is

generally not considered jurisdictional and is therefore waived if not specifically

raised.").


Even if the argument were to be considered, it would not warrant

dismissal of plaintiff's lawsuit.  Rule 17(b) of the Federal Rules of Civil Procedure

provides that

The capacity of an individual, other than one acting in a
representative capacity, to sue or be sued shall be
determined by the law of the individual's domicile.  The
capacity of a corporation to sue or be sued shall be
determined by the law under which it was organized.  In all
other cases capacity to sue or be sued shall be determined
by the law of the state in which the district court is held,
except (1) that a partnership or other unincorporated
association, which has no such capacity by the law of such

> state, may sue or be sued in its common name for the
> purpose of enforcing for or against it a substantive right
> existing under the Constitution or law of the United
> States . . . .

New York's General Associations Law affords an unincorporated association the capacity to sue through its president or treasurer.  N.Y. Gen. Ass'ns Law § 12. Because the statute "is generally viewed as a pleading and procedural aid, and not as denying a right of action to an association lacking officers bearing such titles, suit can be brought in the name of an officer who is the functional equivalent to a president or treasurer."  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp.2d 48, 62 (N.D.N.Y. 2003) (internal quotations and citations omitted).  However, the filing of a lawsuit "in the name of the unincorporated association alone, and not through its president or treasurer, or an officer who executes equivalent functions . . .  is not a fatal defect and can be corrected" by filing an Amended Complaint in the name of the appropriate officer.  *Id.*   Accordingly, the Court finds that defendants have waived their argument regarding plaintiff's capacity to sue and that, in any event, plaintiff's error in filing this lawsuit in the name of the unincorporated association alone does not require dismissal of the lawsuit.


Finally, the Court notes that § 18 of the General Associations Law, which requires the filing of a certificate with the department of state, applies only to associations defined by statute as a "joint stock association" or a "business trust."  *See Formula One Constructors Ass'n v. Watkins Glen Grand Prix Corp.*, 110 M.2d 247, 249 (Sup. Ct. Schuyler County 1981).

## First Cause of Action –  CERCLA

_____The amended complaint asserts a CERCLA contribution action against

defendants Booth Oil, George Booth, Jr., George Booth, III, Joseph Chalhoub, Ahsen

Yelkin, Breslube Industries (as the general partner of Breslube Enterprises), Lonsdale

Schofield, Schofield Oil, and Speedy Oil.  Dkt. #129.

**Standing**

Defendants argue that plaintiff cannot maintain a CERCLA contribution

claim because plaintiff's members executed the Order on Consent with NYSDEC in

their individual capacities.  Dkt. #239, p.13; Dkt. #262, p.2.

Plaintiff explains that the name of the association was used for

convenience because there were a large number of members [5] and argues that a

representative action is permissible because it is "seeking contribution, a form of

restitution for the group as a whole, not individual damages for its individual members."

Dkt. #246, p.1;  Dkt. #260, p.20.  However, plaintiff seeks permission to amend the

complaint to name the eight remaining corporations, each of which were identified by

name in the first amended complaint and were signatories to the Order on Consent with

the NYSDEC, as representatives of the association.  Dkt. #246, p.11; Dkt. #260, pp.19

& 21.

_____

[5] Originally, there were approximately 25 members of plaintiff, but many of those members have
satisfied their obligations to the group by making cash payments in exchange for a release.  Dkt. #246,
p.9; Dkt. #260, p.18.  Plaintiff acknowledges that the amounts recovered from the released corporations
will reduce the amount that plaintiff can recover in this action.  Dkt. #260, p.18.

> Members of an association may bring an action on behalf of
> themselves and all other members of the association.
> Section 12 of the General Associations Law, providing that
> an action may be maintained by the president or treasurer of
> an unincorporated association does not contradict the
> common-law rule that a representative action may be
> brought in the names of all of the members of an
> association.

*McOwen v. Boccaccio*, 79 A.D.2d 1098 (4th Dep't 1981); *see LeFebvre v. Kelly*, No. 83

CV 3211, 1987 WL 12036 at *3 (E.D.N.Y. May 21, 1987).  However, it would be futile to

permit an amendment of the complaint to permit the members to proceed as

representatives of the group unless the group itself has standing.


The Supreme Court of the United States has "recognized that an

association has standing to bring suit on behalf of its members when: (a) its members

would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit."

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 344 (1977).  In the

instant case, the corporations who have funded cleanup of the site have standing to

seek contribution from other responsible parties.  Moreover, the very purpose of the

Booth Oil Site Administrative Group is to administer and fund the cleanup of the site.

With respect to the third prong, it is not necessary for each individual member to

participate in this action because the Court has broad discretion to consider the

absence of responsible parties from the action and the adequacy of the contribution of

those parties which settled with the plaintiff when it apportions liability among

responsible parties.  *See Goodrich Corp. v. Town of Middlebury*, 311 F.3d 154, 170 (2d Cir. 2002) (allocation of response costs is "an equitable determination based on the district court's discretionary selection of the appropriate equitable factors in a given case."), *cert. denied,* 539 U.S. 937 (2003); *Bedford Affiliates v. Sills*, 156 F.3d 416, 429 (2d Cir. 1998).   Accordingly, it is recommended that plaintiff be permitted to amend its complaint to include the eight corporations as representatives of the association.


**42 U.S.C. § 9613(f)(1)**

Before it can turn its attention to the merits of the various motions for summary judgment with respect to the CERCLA cause of action, the Court must first address the viability of the cause of action in light of the decision of the United States Supreme Court in *Cooper Industries v. Aviall Services, Inc.*, 543 U.S. 157 (2004).


CERCLA's contribution statute provides, *inter alia*, that

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title.

42 U.S.C. § 9613(f)(1).  In *Cooper Industries*, the Supreme Court considered  "whether a private party who has not been sued under § 106[7] or § 107(a)[8] may nevertheless obtain contribution under § 113(f)(1)[9] from other liable parties.  543 U.S. at 160-61.

---

[7] Section 106 of CERCLA is codified at 42 U.S.C. § 9606.

[8]  Section 107 of CERCLA is codified at 42 U.S.C. § 9607.

[9] Section 113 of CERCLA is codified at 42 U.S.C. § 9613.

Upon review of the plain language of the statute, the Supreme Court held that a

potentially responsible party cannot obtain contribution pursuant to 42 U.S.C. §

9613(f)(1) unless that party has been subjected to a civil action pursuant to 42 U.S.C. §

9606 or

§ 9607(a).  *Id.* at 166-67.  Since it is undisputed that no such civil action was

commenced against plaintiff, *Cooper Industries* forecloses any claim pursuant to 42

U.S.C. § 9613(f)(1).


**42 U.S.C. § 9613(f)(3)(B)**

Plaintiff asserts that its administrative order on consent, executed by the

NYSDEC on June 23, 2003, satisfies 42 U.S.C. § 9613(f)(3)(B), because the Order on

Consent resolves plaintiff's liability to New York.  Dkt. #241, p.3.


Defendants argue that this document does not resolve plaintiff's CERCLA

liability because it is based solely upon the NYSDEC's authority under New York law.

Dkt. #236, p.2; Dkt. #239, p.4.


The Supreme Court's decision in *Cooper Industries* noted that the statute

provided an alternate avenue for contribution – § 9613(f)(3)(B) – which provides that

> A person who has resolved its liability to the United States or
> a State for some or all of a response action or for some or all
> of the costs of such action in an administrative or judicially
> approved settlement may seek contribution from any person
> who is not party to a settlement referred to in paragraph (2).

42 U.S.C. § 9613(f)(2) provides that

> A person who has resolved its liability to the United States or
> a State in an administrative or judicially approved settlement
> shall not be liable for claims for contribution regarding
> matters addressed in the settlement.

In *Consolidated Edison Company of New York, Inc. v. UGI Utilities, Inc.*,
the Court of Appeals for the Second Circuit clarified that § 9613(f)(3)(B) creates a right
to contribution "only when liability for CERCLA claims, rather than some broader
category of legal claims, is resolved."  423 F.3d 90, 95 (2d Cir. 2005), *petition for cert.
pending*, No. 05-1323 (filed April 14, 2006).  In other words, § 9613(f)(3)(B) "does not
permit contribution actions based on the resolution of liability for state law – but not
CERCLA – claims."  *Id.* at 96.  In that case, the Court of Appeals denied plaintiff's right
to pursue a contribution claim pursuant to § 9613(f)(3)(B) because the Voluntary
Cleanup Agreement[10] negotiated with the NYSDEC only resolved claims pursuant to
New York law.  *Id.*

In reaching its conclusion that § 9613(f)(3)(B) "does not permit
contribution actions based on the resolution of liability for state law – but not CERCLA –
claims," the Court of Appeals quoted the district court decision in *W.R. Grace & Co. v.*

---

[10] In that Voluntary Cleanup Agreement, the NYSDEC promised that if plaintiff cleaned up the
properties specified in the agreement according to the agreement's terms, the NYSDEC would furnish
Con Ed with a Release and Covenant Not to Sue stating that the NYSDEC "releases, covenants not to
sue, and shall forebear from bringing any action, proceeding, or suit pursuant to the [New York]
Environmental Conservation Law, the Navigation Law or the State Finance Law, and from referring to the
Attorney General any claim for recovery of costs incurred by the [NYSDEC] . . . for further investigation
and remediation of the Site, based upon the release or threatened release of Covered Contamination."
423 F.3d at 96.

*Zotos International, Inc.,* which states: "Just as a party must be sued under CERCLA before it can maintain a section 113(f)(1) contribution claim, it must settle CERCLA liability before it can maintain a claim under section 113(f)(3)."  *Id.*  In *W.R. Grace & Co.*, the Hon. William M. Skretny determined that plaintiff had not settled its liability to the United States or a State within the meaning of § 9613(f)(3)(B) because the Consent Order did not state that the NYSDEC was exercising any authority under CERCLA; did not indicate that the EPA concurred with the remedy selected; and did not provide a release as to any CERCLA claims.  No. 98-CV-838, 2005 WL 1076117, at *7 (W.D.N.Y. May 3, 2005).  In fact, the Court noted that the Consent Order made no mention of CERCLA at all.  *Id.*

The *W.R. Grace* decision noted that CERCLA authorized the President, who delegated authority to the Environmental Protection Agency, to respond to the release or threatened release of hazardous substances into the environment.  *Id.* at *3, *citing* 42 U.S.C. §§ 9604 & 9606.  If a potentially responsible party is capable of responding to the situation, the EPA may enter into a settlement agreement, which must be entered in the appropriate United States district court as a consent decree.  *Id.* at *4, *citing* 42 U.S.C. § 9622(d)(1)(A).  In addition, the EPA may delegate its enforcement authority, including the authority to enter into a settlement agreement with respect to a particular site, to a state upon request.  *Id., citing* 42 U.S.C. § 9604. Without such a contract or cooperative agreement with the EPA, however, the state has no authority to settle a potentially responsible party's liability pursuant to CERCLA, but can only settle the potentially responsible party's liability to the state.  *Id.* at *5.

The Arizona district court undertook a similar analysis and reached the same conclusion as in *W.R. Grace*.  *See Asarco, Inc. v. Union Pacific R.R. Co.*, No. CV 04-2144, 2006 WL 173662 (D. Ariz. Jan. 24, 2006).  In *Asarco*, the district court concluded that

> It makes little sense that an agreement with a state agency based on state law without any authorization from federal authorities could serve as a springboard for a CERCLA contribution claim.  This is especially true where Congress has set forth specific guidelines for state involvement in CERCLA enforcement.  As discussed above, before a state can enter into a CERCLA settlement, it must receive authorization from the EPA. 42 U.S.C. § 9604(d)(1)(A).  To allow an agreement between a state and a private entity that lacks EPA backing to serve as a basis for a CERCLA contribution claim would effectively circumvent the requirement that states need to seek authorization from the EPA in order to participate in the CERCLA process.

*Id.* at *7.

In *Niagara Mohawk Power Corporation v. Consolidated Rail Corporation*, the district court was presented with a Consent Order providing:

> (1) that "Niagara Mohawk shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for 'matters addressed' pursuant to and in accordance with this Order;" (2) "Furthermore, . . . [Niagara Mohawk] is entitled to seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. Section 9613 (f)(2);" and (3) providing for a release and covenant not to sue pursuant to New York law and "any other provision of State or Federal statutory or common law involving or relating to investigative or remedial activities relative to or arising from the disposal of hazardous wastes or hazardous substances . . . at the Site."

436 F. Supp.2d 398, 401-02 (N.D.N.Y. 2006).  Because there was no evidence,

argument, or even allegation that federal authorities vested CERCLA authority in the

NYSDEC with regard to this agreement, the Court determined that "although the

Amended Consent Order may be an administrative resolution of Niagara Mohawk's

liability to the State, it does not resolve CERCLA liability and no action pursuant to

§ 9613(f)(3)(B) can be maintained." *Id.* at 402.[11]


In *Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, in contrast, Judge

Larimer rejected defendant's argument that the NYSDEC lacked authority to settle its

CERCLA liability and distinguished *W.R. Grace* on the ground that the consent orders

---

[11]  Plaintiff's rely upon *Pfohl Bros. Landfill Site Steering Committee v. Allied Waste Systems, Inc.*, in which Judge Arcara adopted Judge Foschio's recommendation that a contribution action be permitted pursuant to 42 U.S.C. § 9613(f)(3)(B) because:

> Both Orders on Consent state that they are entered into pursuant to the DEC's authority under New York Environmental Conservation Law § 27-1301 et seq., and 42 U.S.C. § 9607, and that the Orders on Consent qualify as State administrative settlements within the meaning of 42 U.S.C. § 9613(f).

255 F. Supp.2d 134, 154 (W.D.N.Y. 2003).  Similarly, in *Benderson Development Company, Inc. v. Neumade Product Corporation,* the undersigned permitted a contribution claim pursuant to 42 U.S.C. § 9613(f)(3)(B) where the Order on Consent provided as follows:

> To the extent authorized under 42 U.S.C. Section 9613 and any other applicable law, Respondent shall not be liable for any claim, now or in the future, in the nature of contribution by potentially responsible parties concerning the alleged contamination which is the subject matter of this Order.  In any future action brought by Respondent against a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the provisions of 42 U.S.C. Section 9613(f)(3) shall apply.

No. 98-CV-241, 2005 WL 1397013, at *9 & 12 (W.D.N.Y. June 13, 2005).  However, the Court notes that both of these decisions were issued before the Court of Appeals for the Second Circuit decided *Consolidated Edison* and alerted the district courts to the need to assess the state's authority to resolve CERCLA liability.

at issue in *Seneca Meadows*[12] "expressly state that the parties agreed that [defendant] had resolved its liability to the state for purposes of CERCLA." 427 F. Supp.2d 279, 287 (W.D.N.Y. 2006). While there was no evidence that the NYSDEC was operating pursuant to a cooperative agreement with the EPA, the district court concluded

> that does not mean that [plaintiff] could not have "resolved its liability to [the] State" by means of the consent orders. 42 U.S.C. § 9613(f)(3)(B). Although a state may not be able to act on behalf of the federal government absent a delegation of authority from the EPA, or to *completely* resolve a party's CERCLA liability, § 107(a)(4)(A) "contains no requirement that a state obtain authorization from the federal government prior to engaging in response actions. States need not obtain EPA authorization to clean up hazardous waste sites and recover costs from potentially responsible parties."

*Id., quoting Washington State Dep't of Transp. v. Natural Gas Co., Pacificorp*, 59 F.3d 793, 801 (9th Cir. 1995). Accordingly, Judge Larimer determined that "the consent orders amount to a settlement of [plaintiff's] liability to the State not just under state law, but under CERCLA as well" and permitted plaintiff's contribution action pursuant to 42 U.S.C. § 9613(f)(3)(B). *Id.*

---

[12] The consent orders in *Seneca Meadows* provided as follows:

> To the extent authorized under 42 U.S.C. Section 9613, . . . [plaintiff] shall be deemed to have resolved its liability to the State for purposes of contribution protection provided by CERCLA Section 113(f)(2) for "matters addressed" pursuant and in accordance with the Order . . . Furthermore, to the extent authorized under 42 U.S.C. Section 9613(f)(3)(B), by entering in this administrative settlement of liability, if any, for some or all of the response action and/or for some or all of the costs of such action, [plaintiff] is entitled to seek contribution from any person except those who are entitled to contribution protection under 42 U.S.C. Section 9613(f)(2).

427 F. Supp.2d at 286.

The Court of Appeals for the Second Circuit recognized the divergent conclusions of these cases in the following footnote to its decision in *Schaefer v. Town of Victor*:

> The resolution of liability with a State for a clean-up under state law may, under certain circumstances, also resolve liability for response costs under CERCLA.  Indeed, the statute seems to anticipate that possibility.  *Compare Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, 427 F.Supp.2d 279 , 286-87 (W.D.N.Y. 2006) (holding that a party which entered into a consent order with the DEC could seek contribution under § 113(f)(3)(B) where the consent order expressly stated that the party had resolved its liability to the state for purposes of CERCLA), *with Niagara Mohawk Power Corp. v. Consol. Rail Corp.,* 436 F.Supp.2d 398, 401-02 (N.D.N.Y. 2006) (holding that a party which entered into a consent order with the DEC could not seek contribution under § 113(f)(3)(B) where the administrative order did not resolve CERCLA liability and "there is no evidence, argument, or even allegation that federal authorities vested CERCLA authority in the DEC with regard to the agreement" (citing *Consol. Edison*, 423 F.3d at 96)).

457 F.3d 188, 202 n.19 (2d Cir. 2006).  However, the Court of Appeals declined to resolve the apparent conflict between the cases.  *Id.*

In the instant case, the Order on Consent states that it is issued pursuant to the NYSDEC's "authority under [New York's Environmental Conservation Law ("ECL")], Article 27, Title 13 and ECL 3-0301."  Dkt. #242-2, p.104.   The Order on Consent provides, in pertinent part, as follows:

> If, after review, the [NYSDEC] accepts and approves the engineer's certification that construction of the remedial program was completed in accordance with the Approved Remedial Design, then . . . such acceptance shall constitute a release for each and every claim, demand, remedy or action whatsoever against Respondents, their respective directors, officers, employees, and their parents, affiliates,

-39-

> predecessor, successors and assigns who are not otherwise
> responsible parties which the [NYSDEC] has or may have
> pursuant to Article 27, Title 13 of the ECL or pursuant to the
> Comprehensive Environmental Response, Compensation
> and Liability Act (42 U.S.C. § 9604, et seq.), relative to or
> arising from the disposal of hazardous waste or substances
> at the Site and except as specified herein, Respondents'
> obligations pursuant to this Order shall be deemed satisfied
> and terminated . . . .

Dkt. #242-2, p.111.  Although the Order on Consent does not suggest that the

NYSDEC possessed authority to resolve plaintiff's CERCLA liability to the EPA, it does

purport to resolve plaintiff's CERCLA liability to the NYSDEC.  Applying the analysis of

*Seneca Meadows, Inc. v. ECI Liquidating, Inc.*, the Court recommends that plaintiff be

permitted to seek contribution from other potentially responsible parties pursuant to 42

U.S.C. § 9613(f)(3)(B) for those costs incurred pursuant to the consent order which

exceed its proportionate share of liability.


**42 U.S.C. § 9607**

Given the changing legal landscape, plaintiff asks the Court to allow it to

amend the complaint to allege a cause of action under 42 U.S.C. § 9607.  Dkt. #241,

p.6.


Defendants argue that plaintiff cannot pursue a claim pursuant to 42

U.S.C. § 9607 because it is a potentially responsible party.  Dkt. #262, p.12.


> In its original form, CERCLA contained no express provision
> authorizing a private party that had incurred cleanup costs to
> seek contribution from other PRP's.  In numerous cases,
> however, District Courts interpreted the statute – particularly

the § 107 provisions outlining the liabilities and defenses of persons against whom the Government may assert claims – to impliedly authorize such a cause of action.

The 1986 amendments included a provision – CERCLA § 113(f) – that expressly created a cause of action for contribution . . . . Other SARA provisions, moreover, appeared to endorse the judicial decisions recognizing a cause of action under § 107 by presupposing that such an action existed.  An amendment to § 107 itself, for example, refers to "amounts recoverable in an action under this section."  42 USC § 9607(a)(4)(D) . . . . The new contribution section also contains a reference to a "civil action . . . under this section."  42 USC § 9613(f)(1) . . . . Thus the statute now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107.

*Key Tronic Corp. v. United States*, 511 U.S. 809, 816 (1994) (footnote omitted).


Subsequent to the Supreme Court's decision in *Key Tronic*, the Court of

Appeals for the Second Circuit interpreted the 1986 amendments and determined that

The language of CERCLA suggests Congress planned that an innocent party be able to sue for full recovery of its costs, *i.e.*, indemnity under § 107(a), while a party that is itself liable may recover only those costs exceeding its pro rata share of the entire cleanup expenditure, *i.e.*, contribution under § 113(f)(1).

*Bedford Affiliates*, 156 F.3d at 424.  Although the dissent in *Cooper Industries*

challenged this interpretation of the statute, the United States Supreme Court expressly

declined to consider whether decisions "holding that a private party that is itself a

[potentially responsible party] may not pursue a § 107(a) action against other

[potentially responsible parties] for joint and several liability" are correct.  543 U.S. at

169-70.  However, the United States Supreme Court very recently returned to this

question in *United States v. Atlantic Research Corp*. and held that potentially

responsible parties may maintain a cause of action to recover costs from other

potentially responsible parties pursuant to § 107(a).  No. 06-562, __ U.S. __, 2007 WL

1661465 (June 11, 2007).


The Supreme Court's very recent decision in *Atlantic Research* comports

with the Court of Appeals' determination in *Consolidated Edison* that the Supreme

Court's holding in *Cooper Industries*

> impels us to conclude that it no longer makes sense to view
> section 113(f)(1) as the means by which the section 107(a)
> cost recovery remedy is effected by parties that would
> themselves be liable if sued under section 107(a).  Each of
> those sections, 107(a) and 113(f)(1), embodies a
> mechanism for cost recovery available to persons in
> different procedural circumstances.
>
> Given that section 107(a) is distinct and independent
> from section 113(f)(1), and that section 113(f)(1)'s remedies
> are not available to a person in the absence of a civil action
> as specified in that section, determining whether a party in
> Con Ed's circumstances may sue under section 107(a) is
> easily resolved based on that section's plain language.
> Section 107(a) makes parties liable for the government's
> remedial and removal costs and for "any other necessary
> costs of response incurred by any other person consistent
> with the national contingency plan."  42 U.S.C.
> § 9607(a)(4)(B).  The only questions we must answer are
> whether Con Ed is a "person" and whether it has incurred
> "costs of response."  We have no doubt that Con Ed is a
> "person" under CERCLA because it is a "firm" or
> corporation" within the meaning of the act.  42 U.S.C.
> § 9601(21).  Moreover, Con Ed has incurred and is incurring
> "costs of response" in that it is incurring costs of "removal"
> and "remedial action," § 9601(25), at the sites of the
> Westchester Plants, and those costs were not imposed on
> Con Ed as the result of an administrative or court order or
> judgment.

Unlike some other courts, we find no basis for reading into this language a distinction between so-called "innocent" parties and parties that, if sued, would be held liable under section 107(a).  Section 107(a) makes its cost recovery remedy available, in quite simple language, to *any* person that has incurred necessary costs of response, and nowhere does the plain language of section 107(a) require that the party seeking necessary costs of response be innocent of wrongdoing.

Moreover, we believe we would be impermissibly discouraging voluntary cleanup were we to read section 107(a) to preclude parties that, if sued, would be held liable under section 107(a) from recovering necessary response costs.  Were this economic disincentive in place, such parties would likely wait until they are sued to commence cleaning up any site for which they are not exclusively responsible because of their inability to be reimbursed for cleanup expenditures in the absence of a suit.  This would undercut one of CERCLA's main goals, encourag[ing] private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others.

For these reasons, we hold that section 107(a) permits a party that has not been sued or made to participate in an administrative proceeding, but that, if sued, would be held liable under section 107(a), to recover necessary response costs incurred voluntarily, not under a court or administrative order or judgment.

423 F.3d at 99-100 (internal citations, quotations and footnotes omitted).

In reaching this conclusion, the Court of Appeals found it unnecessary to revisit *Bedford Affiliates* "because of critical distinctions between that case and this one," which it explained as follows:

First, unlike in this case where there has been no adjudication of Con Ed's liability for response costs and no administrative or judicially approved settlement requiring Con Ed to incur those expenses, in *Bedford Affiliates*, the plaintiff had entered into two consent orders with the

[NYSDEC], pursuant to which the plaintiff began cleanup and remedial action. . . .

\* \* \*

Second, the *Bedford Affiliates* plaintiff, having agreed to the consent order, put the extent of its liability at issue by proceeding to seek recovery under both sections 107(a) and 113(f)(1).  As noted, under section 113(f), the district court found that the plaintiff was partially responsible for the costs of response.  To rule that in those circumstances Bedford could have proceeded under section 107(a) to seek recovery of one hundred percent of the costs, this court would have had to hold in substance that a party already adjudicated liable for a portion of the costs of response under section 113(f)(1) could circumvent that section by recovering under section 107(a) that portion of the costs attributed to it by the adjudication.  That is, having found that the district court did not abuse its discretion in attributing to Bedford responsibility for five percent of the necessary response costs, the court did not have to reach the question of whether Bedford could proceed under section 107(a) to recoup those costs.

Here, there have been no consent orders and no proceeding apportioning necessary costs of response to Con Ed. and these differences distinguish this case from Bedford Affiliates.  In sum, we read *Bedford Affiliates* to hold that a party that has incurred or is incurring expenditures under a consent order with a government agency and has been found partially liable under section 113(f)(1) may not seek to recoup those expenditures under section 107(a).  Our holding here – that a party that has not been sued or made to participate in an administrative proceeding, but if sued, would itself be liable under section 107(a), may still recover necessary response costs incurred voluntarily, not under a court or administrative order or judgment – does not conflict with *Bedford Affiliates*.

*Id.* at 101-02.

Thereafter, in *Schaefer v. Town of Victor*, the Court of Appeals for the

Second Circuit addressed yet another factual permutation in the quest to apportion

costs of environmental cleanup.  457 F.3d 188, 201 (2d Cir. 2006).  The Court of

Appeals explained the similarities and differences between *Schaefer* and its prior

decisions as follows:

> *Schaefer*, like the plaintiff in *Consolidated Edison,* is a PRP
> who has not been sued under either § 106 or § 107 but who
> seeks recovery of necessary response costs.  As in
> *Consolidated Edison*, there has been no previous finding of
> partial liability under § 113(f)(1).  That is, unlike in *Bedford
> Affiliates*, there is no danger here that "a party already
> adjudicated liable for a portion of the costs of response
> under section 113(f)(1) could circumvent that section by
> recovering under section 107(a) that portion of the costs
> attributed to it by the adjudication."  *Consol. Edison*, 423
> F.3d at 102.
>
> Like the plaintiff in *Consolidated Edison*, Schaefer also
> initiated cleanup and remedial action voluntarily (i.e., not
> pursuant to a court order or administrative order or
> judgment).  However, as noted above, Schaefer, unlike the
> plaintiff in *Consolidated Edison*, did enter into two consent
> orders with the [NYSDEC] . . . .

*Id.*  Because Schaefer began to incur response costs prior to the execution of the

Consent Order, the Court concluded that

> As a result, in contrast to *Bedford Affiliates*, where "Bedford
> agreed to *begin* cleanup procedures" pursuant to a consent
> order with the DEC, *see Bedford Affiliates*, 156 F.3d at 421
> (emphasis added), Schaefer's response costs were not
> incurred "solely due to the imposition of liability through a
> final administrative order."  *Consol. Edison*, 423 F.3d at 101.
> Thus, under the holding of this Court in *Consolidated
> Edison*, Schaefer may bring this action under § 107.

*Id.* at 202.  In the instant case, as in *Schaefer*, plaintiff voluntarily incurred costs of

cleanup before the Consent Orders were entered.  Accordingly, it is recommended that

plaintiff be permitted to proceed pursuant to 42 U.S.C. § 9607(a) with respect to those

costs it incurred voluntarily.  *See Atlantic Research*, 2007 WL 1661465, at *7, n.6

("costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B) and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).").  The Court notes that both provisions require proof of the same elements. *See Atlantic Research Corp*., 459 F.3d 827, 831 (8th Cir. 2006), *affirmed*, 2007 WL 1661465.  The Court further notes that plaintiff will not be able to recover the same expenses under both provisions in any event.  *Atlantic Research*, 2007 WL 1661465, at *7.  Accordingly, the Court turns to the merits of plaintiff's claim for judgment on liability.

**Standards for Entitlement to Judgment on Liability**

To establish entitlement to judgment on liability as a matter of law, plaintiff must demonstrate that:

    a.  the defendant is within one of the four categories of responsible parties enumerated in 9607(a) of CERCLA, *to wit*:

       (1) the owner or operator of a facility;

       (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

       (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance;

b. the landfill site is a facility as defined in § 9601(9);

c. there is a release or threatened release of hazardous substances at the facility;

d. the plaintiff incurred costs responding to the release or threatened release; and

e. the costs and response actions conform to the national contingency plan.

*See* 42 U.S.C. § 9607(a)*; see also B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir. 1996), *cert. denied sub nom., Zollo Drum, Inc. v. B.F. Goodrich Co.*, 524 U.S. 926 (1998), *overruled on other grounds by New York v. National Servs. Indus.*, 362 F.3d 682 (2d Cir. 2003); *Buffalo Color Corp. v. AlliedSignal, Inc.*, 139 F. Supp.2d 409, 415 (W.D.N.Y. 2001).  If each of these elements are established on undisputed facts, and the defendant is unable to demonstrate by a preponderance of the evidence the existence of one of the three affirmative defenses set forth in § 9607(b),[13] then plaintiff is entitled to summary judgment on the issue of liability, even when genuine issues of material fact remain as to appropriate damages.  *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir. 1993).  The parties do not dispute that the site is a facility; that there has been a release; or that plaintiff has incurred response costs conforming to the national contingency plan.  Dkt. #87, p.4; Dkt. #174, p.9.

---

[13] Once a plaintiff makes a *prima facie* showing, a defendant may avoid liability only if it establishes by a preponderance of the evidence that the release or threatened release was caused by an act of God, an act of war, certain acts or omissions of third parties other than those with whom the defendant has a contractual relationship, or a combination of these reasons.  *B.F. Goodrich*, 99 F.3d at 514, *citing* 42 U.S.C. § 9607(b).

<u>Plaintiff's Motion for Summary Judgment Against Booth Oil Company</u>

Plaintiff moves for summary judgment on its contribution claim against Booth Oil Company.  Dkt. #175.   Plaintiff asserts that Booth Oil is liable as the owner and operator of the Robinson Street facility.  Dkt. #175-41, p.3.

Booth Oil argues that it cannot be held liable because it resolved its liability to the NYSDEC with the 1982 Order on Consent with the NYSDEC.  Dkt. #202, ¶ 4.

Plaintiff argues that the Order on Consent does not constitute a settlement pursuant to section 9613(f)(3)(B) or section 9613(f)(2) because it did not resolve Booth Oil's CERCLA liability.  Dkt. #241, pp.7-9.

Since the 1982 Order on Consent does not mention CERCLA but only references New York's  Environmental Conservation Law; does not attach the Proposal and Schedule so as to permit the Court to assess its scope; and is premised upon closure of the Robinson Street facility, which has yet to be completed, the Court has no difficulty determining that this document is insufficient to resolve Booth Oil's liability. Furthermore, as the evidence is clear that Booth Oil Company has owned part of the Robinson Street facility since its incorporation in 1971 and operated the site (including the Conrail parcel), during the time period in which hazardous substances were disposed at the Robinson Street facility and during the time period in which those substances were released into the environment, it is recommended that plaintiff's

motion (Dkt. #175), for summary judgment be **GRANTED** with respect to the first cause of action against Booth Oil.

<u>Joseph Chalhoub's Motion for Summary Judgment</u>

The amended complaint alleges that Joseph Chalhoub is liable as an operator of the site based on his involvement in every aspect of the operation of the Site beginning on September 14, 1984 including involvement in negotiations with the NYSDEC and other activities specifically related to environmental affairs.  Dkt. #129, ¶ 143.

Joseph Chalhoub argues that he is entitled to summary judgment because he is neither a current operator of the site nor an operator of the site at the time of disposal of hazardous waste.  Dkt. #87, Exh. 5, pp.5-8.  Specifically, Joseph Chalhoub emphasizes that there is no evidence that oil was stored at the Robinson Street facility after 1984 other than in Tank #60 or that such storage contributed to the contamination at the site.  Dkt. #112, p.7.  He argues that the NYSDEC found the area surrounding Tank #60 clean upon demolition in 1988 and considered it separate from the contamination at the Robinson Street facility.  Dkt. #112, p.4.  According to Joseph Chalhoub, the NYSDEC acceptance of closure of Tank #60 demonstrates that Tank #60 was not responsible for any contamination at the site.  Dkt. #87, Exh. 5, p.8.  In any event, Joseph Chalhoub affirms that he "was not in charge of the operation of Tank #60."  Dkt. #87, ¶ 54.

Plaintiff argues that Joseph Chalhoub is liable as an operator because he stored oil at Tank #60 and moved it to the Katherine Street facility for processing.  Dkt. #116, pp.8-9.  Plaintiff alleges that his involvement in the closure of Tank 60 demonstrates operation of the Robinson Street facility.  Dkt. #116, pp.10.  Plaintiff also argues that Joseph Chalhoub operated the Robinson Street facility in the place of or together with Booth Oil until it became clear that closing the facility would be too expensive, at which time he abandoned the site.  Dkt. #116, pp.9-10.

"CERCLA prevents individuals from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct prohibited by the Act."  *United States v. Bestfoods*, 524 U.S. 51, 65 (1998).  The Supreme Court has defined an operator as

> someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66-67; *see State of New York v. Shore Realty Corp*., 759 F.2d 1032, 1052 (2d Cir. 1985) (definition excludes "a person, who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the facility," thereby implying "that an owning stockholder who manages the corporation . . . is liable as an 'owner or operator.'").  Although the imposition of operator liability does not require a finding that the defendant directly participated in the day-to-day activities of the site, an operator must be actively involved in decisions regarding disposal of

hazardous substances or environmental compliance on a frequent, regular or ongoing

basis.  *City of New York v. New York Cross Harbor R.R. Terminal Corp*., No. 98 CV

7227, 2006 WL 140555, at *12 (E.D.N.Y. Jan 17, 2006).

In *Cross Harbor*, the district court determined that the following facts

raised a genuine issue of material fact concerning the depth of involvement of Robert

Crawford, the owner and CEO of the contaminated facility, but did not demonstrate

conclusively, as required for summary judgment, that Crawford had the level of

involvement required for a finding of operator liability:

> (1) his signature on one solid waste permit application, (2)
> his designation as a contact person on that solid waste
> permit, (3) his signature on a Solid Waste Management
> Facility Inspection Report as the "Individual in Responsible
> Charge," (4) some correspondence between Crawford and
> the DEC concerning an odor control plan and some other
> improvements designed to bring the facility into compliance
> with environmental regulations vis-a-vis the operations of
> Merco and Safety Clean, and (5) the testimony of two
> witnesses who said Crawford was present at the First
> Avenue Yard on a daily basis and generally described him
> as "the boss" or "number one" at Cross Harbor but did not
> testify that they ever saw or heard Crawford direct anyone
> regarding waste disposal.

*Id.* at *14.

As in the *Cross Harbor* case, the Court finds a question of fact as to

whether Joseph Chalhoub had the level of involvement required for operator liability.

According to George Booth, III, Mr. Chalhoub suggested that Booth Oil hire David Peel,

Director of Operations for Booth Oil, who reported to Mr. Chalhoub regarding the day-

to-day operations of Booth Oil, including the Robinson Street facility.  Dkt. #108. Exh. 2,

pp.137, 139 & 162. Ahsen Yelkin, Manager of Manufacturing for Breslube, testified that

Mr. Chalhoub was his boss, that Mr. Chalhoub directed his work and that he spoke to

Mr. Chalhoub every day. Dkt. #108, Exh. 29, pp.40, 63, 66. Mr. Chalhoub identified

himself as a responsible corporate officer of both Booth Oil and Breslube. Dkt. #117,

Exh. 3. During this time period, Booth Oil/Breslube Industries were negotiating with the

NYSDEC regarding environmental contamination, discovery of additional storage tanks,

and the closure of Tank #60 at the Robinson Street facility. Dkt. #108, Exh. 17, 18, 22,

24 & 27; Dkt. #117, Exh. 2 & 3. Mr. Chalhoub was present at a January 15, 1988

meeting with the NYSDEC regarding these issues and was unable to specifically

describe the "owner/operator relationships for the site." Given the uncertainty as to

Joseph Chalhoub's involvement in the operation of Booth Oil, including the Robinson

Street facility, it is recommended that Joseph Chalhoub's motion (Dkt. ##173 & 179),

for summary judgment be **DENIED** with respect to the first cause of action.


<u>Breslube Industries' Motion for Summary Judgment</u>

The amended complaint alleges that Breslube Industries is liable as an

arranger based on deliveries of used oil to the site between 1983 and 1985. Dkt. #129,

¶ 144.


Breslube Industries argues that it is entitled to summary judgment

because there is no evidence of any hazardous waste disposal at the Robinson Street

facility after 1981. Dkt. #112, p.5. As a result, Breslube Industries argues that it cannot

be held liable as an arranger. Dkt. #112, p.8.

Because Booth Oil's Katherine Street facility was not operating following a fire in early 1983, plaintiff asserts that Schofield Oil and Breslube Enterprises, "likely" made deliveries to Booth Oil's Robinson Street facility and that a certain portion of the oil was stored in Tank 60 at Booth Oil's Robinson Street facility.  Dkt. #108, ¶ ¶ 7-8.

The Court agrees that evidence demonstrating that Breslube Industries transported oil to Booth Oil during the time when oil was being delivered to and stored in Tank #60 at the Robinson Street facility is sufficient to defeat Breslube Industries' motion for summary judgment with respect to the first cause of action.  Dkt. #117, Exh. 13.   Accordingly, it is recommended that the motion (Dkt. #173 & 179), be **DENIED**.

### Lonsdale Schofield & Schofield Oil's Motion to Dismiss

Plaintiff has no objection to defendants' motion to dismiss this claim against Lonsdale Schofield and Schofield Oil without prejudice.  Dkt. #162, ¶ 4; Dkt. #189-13, ¶¶ 30-31.  Accordingly, it is recommended that Lonsdale Schofield and Schofield Oil's motion (Dkt. #162), to dismiss the first cause of action be **GRANTED** without prejudice.

### Speedy Oil's Motion for Summary Judgment

The amended complaint alleges that Speedy Oil is liable as an arranger and/or transporter of hazardous substances to the Robinson Street facility while awaiting further processing at the Katherine Street facility.  Dkt. #129, ¶ 147.

Speedy Oil argues that summary judgment must be granted because there is no evidence that Speedy Oil ever delivered or arranged for the delivery of oil at the Robinson Street facility.  Dkt. #174, p.9.  In support of its motion, Joseph Chalhoub, Speedy Oil's president, declares that "Speedy Oil did not deliver oil to the Robinson Street facility."  Dkt. #173, ¶ 5.

Plaintiff responds that documents demonstrate that Speedy Oil Services delivered oil to Booth Oil, but concedes that depositions of David Peel, Joseph Chalhoub, Mary Lynn and Mary Brandys Fiodaliso are required to determine whether that oil was stored at the Robinson Street facility.  Dkt. #189-13, ¶¶ 10-22.

The Court agrees that evidence demonstrating that Speedy Oil Services transported oil to Booth Oil during the time when oil was being stored in Tank #60 at the Robinson Street facility is sufficient to defeat Speedy Oil's motion for summary judgment with respect to the first cause of action.  Accordingly, it is recommended that the motion (Dkt. ##173 & 179), be **DENIED**.

<u>Ahsen Yelkin's Motion for Summary Judgment</u>

The amended complaint alleges that Ahsen Yelkin is liable as an operator of the site.  Dkt. #129, ¶ 148.

The Court finds a question of material fact as to whether Ahsen Yelkin had the level of involvement required for operator liability.  Mr. Yelkin was the General

Manager of Breslube USA/Booth Oil when PCB contaminated fuel oil was discharged into the Niagara River and while the company was negotiating with the NYSDEC regarding the disposal of PCB contaminated fuel oil from storage tanks and closure of Tank #60.  Dkt. #108, Exh. 17-24, 27 & 35, ; Dkt. #117, Exh. 3.  Accordingly, it is recommended that Ahsen Yelkin's motion for summary judgment (Dkt. #183), be **DENIED** with respect to the first cause of action.


### Second & Third Causes of Action – New York Navigation Law

The amended complaint seeks to hold Booth Oil, George Booth, Jr., George Booth, III, Breslube Industries, Joseph Chalhoub, and Ahsen Yelkin strictly liable pursuant to section 181(1) & (5) of New York's Navigation Law.  Dkt. #129, ¶¶ 149-155.  Alternatively, the amended complaint seeks contribution pursuant to section 176(8) of New York's Navigation Law.  Dkt. #129, ¶¶ 156-157.


**Preemption**

As an initial matter, defendants argue that plaintiff has failed to allege facts to demonstrate damages pursuant to New York's Navigation Law which are not preempted by CERCLA.  Dkt. #112, pp.8-9.  Plaintiff argues that the potential remains that the damages available pursuant to New York's Navigation Law are distinct from and not inconsistent with CERCLA.  Dkt. #116, p.14.


The Court of Appeals for the Second Circuit has determined that CERCLA "does not expressly preempt state law, but simply prohibits states from 'recovering

compensation for the same removal costs or damages or claims' under both CERCLA and state or other federal laws . . . .'" *Bedford Affiliates*, 156 F.3d at 426, *quoting Shore Realty*, 759 F.2d at 1041; *see Volunteers of America of W.N.Y. v. Heinrich*, 90 F. Supp.2d 252, 257 (W.D.N.Y. 2000) ("CERCLA does not prevent a plaintiff from recovering damages under state law that are not duplicative of the damages it recovers under CERCLA.").  For example, CERCLA's definition of hazardous substance does not include petroleum, or the hazardous substances normally found in refined petroleum, including unadulterated waste oil.  42 U.S.C. § 9901(14); *see City of New York v. Exxon Corp.,* 766 F. Supp. 177, 186 (S.D.N.Y. 1991); *Aces & Eights Realty, LLC v. Hartman*, No. 02-CV-6032, 2002 WL 31663515, at *6 (W.D.N.Y. Nov. 4, 2002).  However, CERCLA's definition of hazardous substance does include hazardous substances which are added to petroleum or which increase in concentration solely as a result of contamination of the petroleum during use.  *Id.*   Because Booth Oil states that not all of the used oil that it treated between 1960 and 1981 was contaminated,  and because it appears that not all of the oil spills revealed evidence of PCB contamination, it may well be that plaintiff incurred damages responding to discharges of petroleum which are outside of CERCLA's definition of hazardous substance.  Dkt. #188, ¶ 4; Dkt. #211, ¶ 4. Accordingly, it is recommended that plaintiff be permitted to proceed under both CERCLA and the Navigation Law.


**Indemnification/Contribution Under New York Navigation Law**

Defendants move to dismiss the § 181 claim on the ground that one of plaintiff's members, Conrail, is strictly liable under this statute as an owner of the site.

Dkt. #187, p.3.  Plaintiff responds that there is no competent evidence that Conrail discharged oil.  Dkt. #195, pp.5-6.

Section 181(1) of New York's Navigation Law provides that:

Any person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section.

Section 181(5) of New York's Navigation Law provides that:

Any claim by any injured person for the costs of cleanup and removal and direct and indirect damages based on the strict liability imposed by this section may be brought directly against the person who has discharged the petroleum . . . .

The New York Navigation Law defines "claim" as "any claim . . . by an injured person, who is not responsible for the discharge, seeking compensation for cleanup and removal costs incurred or damages sustained as a result of a petroleum discharge." N.Y. Navigation Law § 172(3).

In *White v. Long*, the New York Court of Appeals determined that even though faultless owners of contaminated lands can be deemed dischargers for purposes of Navigation Law § 181(1), "where they have not caused or contributed to (an thus are not 'responsible for') the discharge, they should not be precluded from suing those who have actually caused or contributed to such damage" pursuant to § 181(5).  85 N.Y.2d 564, 569 (1995).  Even where the landowner was liable as a discharger because it could "control activities occurring on its property and has reason to believe that petroleum products will be stored there," the New York Court of Appeals

noted that it could proceed against the actual discharger pursuant to Navigation Law § 181(5) so long as the landowner did not cause or contribute to the contamination. *State v. Green*, 96 N.Y.2d 403, 408 (2001); *see FCA Assocs. v. Texaco, Inc.*, No. 03-CV-6083, 2005 WL 735959, at * 7 (W.D.N.Y. March 31, 2005).

If it is established that the property owner caused or contributed to the spill, the property owner will be precluded from seeking indemnification from another discharger.  *Hjerpe v. Globerman*, 280 A.D.2d 646, 647 (2d Dep't 2001).  However, the party can proceed pursuant to § 176(8) of New York's Navigation Law, which provides as follows:

> Notwithstanding any other provision of law to the contrary, including but not limited to section 15-108 of the general obligations law, every person providing cleanup, removal of discharge of petroleum or relocation of persons pursuant to this section shall be entitled to contribution from any other responsible party.

*See, e.g., State v. Passalacqua*, 19 A.D.3d 786, 790-91 (3d Dep't 2005) (determining that current owner could proceed with his cross claim for indemnification pursuant to New York Navigation Law § 181 even though he had failed to establish, as a matter of law, that he was not responsible for the discharge and that former owner could not proceed with his cross claim for  indemnification because he was a person responsible for a discharge as a matter of law, but could seek contribution form other liable dischargers).

In the instant case, although Conrail is the owner of property from which petroleum has been discharged, and is, therefore, strictly liable as a discharger under

the Navigation Law, Booth Oil has proffered no evidence that Conrail caused any

discharge of petroleum at the Robinson Street facility.  As a result, there is no basis to

dismiss the cause of action pursuant to § 181.  Accordingly, it is recommended that

Booth Oil's motion (Dkt. #179), to dismiss the New York Navigation Law claims be

**DENIED**.


<u>Plaintiff's Motion for Summary Judgment Against Booth Oil</u>

Booth Oil Company is the owner of property from which petroleum has

been discharged.  "Under Navigation Law § 181, strict liability is imposed upon the

owner of a system from which a discharge[14] occurred, regardless of a lack of proof of

any wrongful act or omission by such owner directly causing the discharge."  *Golovach*

*v. Bellmont*, 4 A.D.3d 730 (3rd Dep't 2004) (internal quotation omitted).  As a result, it is

recommended that plaintiff's motion (Dkt. #175), for summary judgment be **GRANTED**

with respect to the New York Navigation Law claims against Booth Oil.


<u>Breslube Industries' Motion for Summary Judgment</u>

Breslube Industries was the sole general partner of Breslube Enterprises

on February 26, 1986, when Breslube Enterprises advised the NYSDEC of its "intention

to reorganize the Booth Oil Facility at Katherine Street . . . under a new corporation

---

[14] "'Discharge' means any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of petroleum into the waters of the state or onto lands from which it might flow or drain into said water, or into waters outside the jurisdiction of the state when damage may result to the lands, waters or natural resources within the jurisdiction of the state."  New York Navigation Law § 172(8).

which will be under the direct control and management of Breslube Enterprises" and

negotiated with NYSDEC, as evidenced by a letter dated September 16, 1986,  to clean

up "the site of our old operations at Robinson Street, North Tonawanda."  Dkt. #108,

Exh. 16 & 22.  During this time period, the NYSDEC noted that "there were still 45+

tanks containing waste oil and oily water" and that "test pits showed that there is still a

considerable amount of oil three to six feet down all over this site."  Dkt. #108, Exh. 19.

This evidence is sufficient to defeat Breslube Industries' motion for summary judgment

on the New York Navigation Law claims.  Accordingly, it is recommended that this

aspect of Breslube Industries' motion (Dkt. #173 & 179), be **DENIED**.


### Joseph Chalhoub's Motion for Summary Judgment

"Consistent with the relevant Federal and State statutes and developing

case law" regarding responsibility for environmental contamination, the New York State

Supreme Court, Appellate Division, Third Department has determined that

> in order to hold a corporate stockholder, officer or employee
> personally liable under the Navigation Law for a discharge
> occurring at a site owned or operated by the corporation,
> that individual must, at a minimum, have been directly,
> actively and knowingly involved in the culpable activities or
> inaction which led to a spill or which allowed a spill to
> continue unabated.  In our view, this standard of liability
> strikes the appropriate balance between holding only
> culpable individuals personally liable for wrongful corporate
> activities leading to a discharge and protecting those
> individual stockholders and officers who remain uninvolved
> in corporate wrongdoing who are entitled to rely on the
> corporate form to insulate them from personal liability.  Thus,
> we hold that in order to impose such personal liability on
> stockholders or officers under Navigation Law § 181(1),
> active wrongful conduct or culpable inaction must be
> established.

*State of New York v. Markowitz*, 273 A.D.2d 637, 642 (3rd Dep't) (internal citations

omitted), *lv. denied*, 95 N.Y.2d 770 (2000); *see e.g.*, *Golovach,* 4 A.D.3d at 732

(defendant's ownership of the service station in his individual capacity before

transferring it to corporation in which he was president, sole shareholder and manager

of the day-to-day affairs of the business, combined with the age of the gasoline storage

tanks, created question of fact as to his liability as a discharger).


In the instant claim, as in the CERCLA cause of action, uncertainty as to

Joseph Chalhoub's involvement in the operation of Booth Oil, including the Robinson

Street facility, causes the Court to recommend that Joseph Chalhoub's motion (Dkt.

##173 & 179), for summary judgment be **DENIED** with respect to the New York

Navigation Law claims.


## Ahsen Yelkin's Motion for Summary Judgment

The Court finds that there is a material question of fact as to whether

Ahsen Yelkin was directly involved in culpable activities or inaction which led to a spill or

allowed a spill to continue unabated.  Mr. Yelkin was the General Manager of Breslube

USA/Booth Oil when fuel oil was discharged into the Niagara River and while the

company was negotiating with the NYSDEC regarding the disposal of fuel oil from

storage tanks and closure of Tank #60.  Dkt. #108, Exh. 17-24, 27 & 35 ; Dkt. #117,

Exh. 3.  Accordingly, it is recommended that Ahsen Yelkin's motion for summary

judgment (Dkt. #183), be **DENIED** with respect to the New York Navigation Law claims.

**Declaration of Damages against Booth Oil**
**with respect to Environmental Claims**

Plaintiff seeks a partial determination of damages, pursuant to Fed. R.

Civ. P. 56(d), in the amount of $1,475,000.  Dkt. #187, pp.14-17.  Plaintiff requests this

amount based upon Booth Oil's current assets of $450,000 plus the total amount of

conveyances made in violation of the Liquidating Plan.  Dkt. #175-41, p.12.  Given that

plaintiff expects to spend $6,204,138.41 for clean up and remediation, it claims that no

reasonable fact finder could conclude that Booth Oil is liable for less than $1,475,000,

which is less than one quarter of the total estimated cost of remediation.  Dkt. #175-41,

pp.12-17.

Booth Oil responds that it would be inappropriate to apportion damages

by summary judgment as requested by plaintiff.  Dkt. #187, p.6.

In resolving contribution claims, CERCLA provides that the court may

allocate response costs among liable parties using such equitable factors as the court

determines are appropriate.  42 U.S.C. § 9613(f)(1).  Because equitable apportionment

is at the very core of a CERCLA contribution action, and involves considerable judicial

discretion in the resolution of factual disputes going to the merits of the case, the

proceeding is akin to a trial and cannot be referred to a magistrate judge for report and

recommendation.  *See Beazer East, Inc. v. Mead Corp.*, 412 F.3d 429 (3rd Cir. 2005),

*cert. denied*, __ U.S. __, 126 S.Ct. 1040 (2006); *Alcan*, 990 F.2d at 722

("apportionment itself is an intensely factual determination.").   As a result, it would be

improper for this court to recommend apportionment of liability.  In any event, the current record is inadequate to assess the relative liability of the potentially responsible parties.  Accordingly, it is recommended that this aspect of plaintiff's motion (Dkt. #175), be **DENIED**.


### Fourth Cause of Action – Enforcement of Liquidating Plan

The first amended complaint alleges that Booth Oil, 118958 Canada, Schofield Oil, George Booth, III, Lonsdale Schofield, Joseph Chalhoub, Ahsen Yelkin, Speedy Oil, EC Holdings, Katherine Street Properties, Safety-Kleen Corporation, and Safety-Kleen Oil Services, Inc., violated the Liquidating Plan of Reorganization by diverting surplus funds from Booth Oil.  Dkt. #129, ¶¶ 158-168.


**Standing**

Defendants argue that the Booth Liquidating Plan of Reorganization does not afford plaintiff standing to pursue this claim.  Dkt. #207, p.3.  As the Court stated in its prior Decision and Order, however, the plan of reorganization is essentially a contract between the parties to the plan.  *Id.*; *see In re Sugarhouse Realty, Inc.,* 192 B.R. 355, 362 (Bankr. E.D.Pa. 1996) ("Confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law."); *see also In re Hillard Dev. Corp.*, 238 B.R. 857, 871-73 (Bankr. S.D. Fla. 1999) (citing cases applying state law contract principles to confirmed plan of reorganization). Although the individual entities were unknown at the time, Booth Oil was aware of its environmental obligations and clearly intended to satisfy those obligations, among

others, by establishing the contingency fund.  As a result, the plaintiff has standing as a

third party beneficiary of the Liquidating Plan.  *See Levin v. Tiber Holding Corp.*, 277

F.3d 243, 248 (2d Cir. 2002) ("Under New York law, a third party is an intended . . .

beneficiary of a contract if recognition of a right to performance in the beneficiary is

appropriate to effectuate the intention of the parties and either (a) the performance of

the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the

benefit of the promised performance.").


**Statute of Limitations**

Defendants also argue that at least some of the transactions at issue are

barred by the statute of limitations.  Dkt. #183, ¶ 10; Dkt. #187, p.4.  To resolve this

question, the Court must delve further into the nature of this cause of action than it was

required to in the context of its Decision and Order regarding this Court's jurisdiction

over the cause of action in the context of a motion to amend the complaint.  Dkt. #127,

p.23.  As set forth in greater detail in the *Hillard* case:

> Although a confirmed plan of reorganization is often
> compared to a contract (a traditional creature of state law),
> and although some courts describe it as such, this court
> nevertheless concludes that a chapter 11 plan confirmation
> order, and obligations arising thereunder, are necessarily
> federal in character.  A confirmed plan of reorganization is a
> creature of the Bankruptcy Code, a comprehensive federal
> remedial statute.  Although obviously a confirmed plan is
> often the fruit of negotiations tantamount to contractual
> bargaining, the contents of a plan (both mandatory and
> permissive), the requirement of judicial approval, and the
> manner in which the parties obtain that approval, are all

> governed by federal law, *i.e.*, the Bankruptcy Code.  See
> generally 11 U.S.C. §§ 1121-1129.  Moreover, federal law
> provides for the implementation of the plan, 11 U.S.C.
> § 1142, and treats a confirmed plan as a federal judgment
> entitled to *res judicata* effect.

*Hillard*, 238 B.R. at 872 (internal citations and footnotes omitted).  Thus, while "courts

*construe* the terms of a plan in accordance with State contract interpretation principles,

reorganization plans, by virtue of the orders confirming them, are regarded as

judgments of the federal courts.  *Id.*   Moreover, because a cause of action for

enforcement of such a plan is federal in origin, the federal rule of accrual applies.  *Id.* at

875; *see* 11 U.S.C. § 1142 (debtor shall carry out the plan and comply with any orders

of the court, including an order to perform any act that is necessary for the

consummation of the plan).


"The general federal rule for accrual is that a cause of action accrues the

moment the plaintiff knows or has reason to know of the injury that is the basis of the

complaint."  *Id.* at 876.   Plaintiff argues that it did not learn of the transfers and their

fraudulent nature until sometime after December 20, 1999.  Dkt. #190, p.40.  Plaintiff

filed its motion to amend the complaint on December 20, 2001.  Dkt. #78.  Thus, this

cause of action is timely so long as the cause of action is governed by a statute of

limitations of two or more years.  As 11 U.S.C. § 1142 does not contain a statute of

limitations, the Court must borrow a statute of limitations from state law.  *Id.* at 873.

The New York Court of Appeals has held that "the choice of the applicable Statute of

Limitations depends on the substantive remedy which the plaintiff seeks."  *Loengard v.*

-65-

*Santa Fe Indus, Inc.*, 70 N.Y.2d 262, 266 (1987).  Because the remedy plaintiff seeks is enforcement of the Liquidating Plan, an equitable remedy, and the statute of limitations for actions seeking equitable relief is six years, the Court finds this claim timely. N.Y.C.P.L.R. § 213(1).

<u>Plaintiff's Motion to Enforce the Liquidating Plan Against Booth Oil</u>

Plaintiff seeks return of Booth Oil's transfer of $450,000 to EC Holdings; $300,000 to Katherine Street Properties; and $275,000 to George Booth, III to the contingency fund.  Dkt. #175.

Booth Oil argues that the payments it made to EC Holdings, Katherine Street Properties and George Booth, III did not violate the terms of the Liquidating Plan of Reorganization because they were not made to the equity shareholders as stockholders.  Dkt. #187, p.8; Dkt. #210, p.2.

Contrary to Booth Oil's argument, the Liquidating Plan of Reorganization clearly provides that Booth Oil will liquidate its assets and deposit any surplus, *i.e.*, funds not required to be paid out for administrative expenses, post-petition accounts payable, taxes, payroll, *etc.*, into a contingency fund for, *inter alia*, environmental creditors.  Dkt. #80, Exh. D, Att. 2, p. 10.  The Court is confident that the $450,000 transferred to EC Holdings and the $300,000 transferred to Katherine Street Properties constitute surplus.  There is no evidence presented to suggest that these payments satisfied obligations of Booth Oil or were made in the normal course of operations of

Booth Oil.  There is also no evidence presented to suggest that Booth Oil received any consideration in return for these payments.

Ahsen Yelkin's statement that all of the transactions at issue involving him and EC Holdings were financial arrangements compensating Ahsen Yelkin for services he rendered to Booth Oil over the years (Dkt. #206), and Booth Oil's argument that "the payment made to Ahsen Yelkin and the satisfaction of his loan was in the nature of a severance payment (Dkt. #186, ¶ 35), are belied by the loan documents and the inclusion of the debt in EC Holdings' tax returns.  Dkt. #223, ¶¶ 17-28.

The Court is similarly persuaded that the $275,000 transferred to George Booth, III constitutes surplus which should have been deposited into the contingency fund.  It is inconceivable that a payment to a shareholder in return for ratification of a decision which would forfeit the corporation's sole remaining asset, without any consideration to the corporation, could be considered an expense made in the normal course of business.

Accordingly, it is recommended that plaintiff's motion (Dkt. #175), to enforce the Liquidating Plan be **GRANTED** and that Booth Oil be directed to obtain repayment of the outstanding promissory notes from Ahsen Yelkin and return of the $275,000 payment to George Booth, III, and deposit same in the contingency fund.

<u>Schofield Oil, Speedy Oil & 118958 Canada's Motion to Dismiss</u>
<u>the Cause of Action to Enforce the Liquidating Plan</u>

_____Schofield Oil, Speedy Oil & 118958 Canada seek dismissal of this claim

on the ground that plaintiff did not receive permission to amend the complaint to assert

this cause of action against them.  Dkt. #162, ¶ 5; Dkt. #163, p.11; Dkt. #174, pp.2-3; .

The defendants are correct that plaintiff did not receive permission to include this claim

against them in its amended complaint.  Dkt. #80, Exh. D, ¶¶ 156-162.   Accordingly, it

is recommended that Schofield Oil's motion (Dkt. #162); Speedy Oil's motion (Dkt.

#173); and 118958 Canada's motion (Dkt. #Dkt. #173), to dismiss this cause of action

against them be **GRANTED**.


<u>Enforcement of the Liquidating Plan Against</u>
<u>Lonsdale Schofield, Joseph Chalhoub, Ahsen Yelkin & EC Holdings</u>

Plaintiff seeks summary judgment enforcing the Liquidating Plan against

George Booth, III, Joseph Chalhoub, Lonsdale Schofield, EC Holdings, Ahsen Yelkin,

and Katherine Street Properties on the ground that they were aware of Booth Oil's

bankruptcy and should be bound by terms of the Liquidating Plan.  Dkt. #190, pp.41-43.

 Lonsdale Schofield, Joseph Chalhoub, Ahsen Yelkin and EC Holdings argue that they

cannot be held liable for Booth Oil's alleged failure to abide by the Liquidating Plan.

Dkt. #174, p.23; Dkt. #183, p.3.  The Court agrees that plaintiff has proffered no reason

to suggest that the liquidation agreement would be enforceable against Ahsen Yelkin

and EC Holdings.  Accordingly, it is recommended that Ahsen Yelkin and EC Holdings'

motion (Dkt. #183), for summary judgment be **GRANTED**.  However, as directors and

officers of Booth Oil, Lonsdale Schofield and Joseph Chalhoub may ultimately bear

responsibility for Booth Oil's violation of the Liquidating Plan.  Accordingly, it is

recommended that Lonsdale Schofield's motion (Dkt. #162), and Joseph Chalhoub's

motion (Dkt. ##173 & 179), be **DENIED**.  Plaintiff's motion for summary judgment  (Dkt.

#189), against these defendants should also be **DENIED** with respect to the fourth

cause of action since there are material facts at issue with respect to this claim.

## Fifth Cause of Action - Accounting

_____Plaintiff's fifth cause of action alleges that because

> Booth Oil did not receive a discharge in bankruptcy and the
> Liquidating Plan of Reorganization required Booth Oil to set
> up a contingency fund for the benefit of the environmental
> creditors, Booth Oil owes a fiduciary obligation to the Plaintiff
> to provide an accounting relative to amounts earned
> subsequent to its bankruptcy filing June 6, 1985, and to pay
> over all surplus diverted from that fund since November 5,
> 1992.

Dkt. #129, ¶ 170.

Plaintiff argues that an accounting is necessary because Booth Oil had a

fiduciary duty to preserve the assets of the corporation for its creditors and to transfer

all surplus to a contingency fund to settle its liability to environmental creditors.  Dkt.

#175, Exh. 41, pp.24-25.  Instead, Booth Oil Company transferred assets so as to

compensate its shareholders, which was a violation of the express terms of the

Liquidating Plan.  Dkt. #175, Exh. 41, p.25.  Plaintiff asserts that an accounting is

required to definitively determine the amount of money diverted from the contingency

fund in violation of the Liquidating Plan.  Dkt. #175, Exh. 41, p.25.

_____Booth Oil argues that the contingency fund established by the Liquidating Plan does not establish a fiduciary relationship which would permit plaintiff to demand an accounting.  Dkt. #166, p.1.  Booth Oil Company also argues that the contingency fund affords plaintiff a contractual remedy, which precludes it from seeking the equitable remedy of an accounting.  Dkt. #166, p.4.

"In order to establish a right to an accounting, which is an action in equity, plaintiff must demonstrate the existence of a fiduciary relationship between himself and defendant, or the existence of a joint venture or other special circumstances warranting equitable relief."  *Rodgers v. Roulette Records, Inc.*, 677 F.Supp. 731, 738 (S.D.N.Y. 1988).  An accounting may also be available "where special circumstances warrant equitable relief in the interests of justice."  *Matter of Fugazy Exp., Inc.*, 124 B.R. 426, 432 (Bankr. S.D.N.Y. 1991).

"Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors."  *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp.2d 290, 308 (S.D.N.Y. 2006); *see Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981), *cert. denied*, 455 U.S. 990 (1982); *In re Adelphia Comm'ns Corp.,* 323 B.R. 345, 386 n.140 (Bankr. S.D.N.Y. 2005) ("Many courts, including the Second Circuit, this one, and the state courts from which the applicable principles have their origin, have said that when a corporation becomes insolvent or enters into the zone of insolvency, the fiduciary duties of a corporation expand from its stockholders to its creditors.").  Thus, the Court finds that Booth Oil

-70-

owed a fiduciary duty to its creditors, including plaintiff, when it filed its bankruptcy

petition.  Alternatively, the evidence of Booth Oil's payments to its directors,

shareholders and/or entities in which its directors or shareholders were involved,

without disclosing such transfers to the bankruptcy court, constitute special

circumstances which warrant the equitable remedy of an accounting to permit plaintiff to

assess the extent to which any assets were diverted from the contingency fund in

violation of the Liquidating Plan.  Finally, the Court notes that, as set forth above, even

though the Liquidating Plan will be interpreted according to contract principles, the

cause of action seeking to enforce it sounds in equity and does not, therefore, preclude

an equitable action for accounting.  Accordingly, it is recommended that plaintiff's

motion (Dkt. #175), for summary judgment be **GRANTED** and Booth Oil's motion (Dkt.

#165), for summary judgment be **DENIED** with respect to this cause of action.


### Sixth & Seventh Causes of Action- Avoidance of Fraudulent Conveyances

_____The sixth cause of action alleges that Booth Oil, George Booth, Jr.,

George Booth, III, Lonsdale Schofield, Joseph Chalhoub, Schofield Oil, 118958

Canada, Safety-Kleen Corporation, Safety-Kleen Oil Services, Inc., Ahsen Yelkin, EC

Holdings, and Katherine Street Properties, are liable for fraudulent conveyances

pursuant to Section 276 of New York's Debtor & Creditor Law.  Dkt. #129, ¶¶ 172-186.

Section 276 of New York's Debtor & Creditor Law provides that

> Every conveyance made and every obligation incurred with
> actual intent, as distinguished from intent presumed in law,
> to hinder, delay, or defraud either present or future creditors,
> is fraudulent as to both present and future creditors.

Thus, pursuant to section 276 of New York's Debtor & Creditor Law, a conveyance

made with actual intent to defraud creditors is fraudulent and may be set aside.  *United States v. Paladin*, 539 F. Supp. 100, 104 (W.D.N.Y. 1982).

The seventh cause of action alleges that Booth Oil, George Booth, III, Lonsdale Schofield, Safety-Kleen Oil Services, Inc., Safety-Kleen Corporation, 118958 Canada, Schofield Oil, and Joseph Chalhoub are liable for fraudulent conveyances pursuant to Section 273 of New York's Debtor & Creditor Law.  Dkt. #129, ¶¶ 187-189. Section 273 of New York's Debtor & Creditor Law provides that

> Every conveyance made and every obligation incurred by a
> person who is or will be thereby rendered insolvent is
> fraudulent as to creditors without regard to his actual intent if
> the conveyance is made or the obligation is incurred without
> a fair consideration.

### Schofield Oil & Speedy Oil's Motion to Dismiss

Schofield Oil seeks dismissal of the sixth and seventh causes of action on the ground that plaintiff did not receive permission to amend the complaint to assert this cause of action against it.  Dkt. #163, p.11.  Speedy Oil seeks dismissal of the sixth cause of action on the ground that plaintiff did not receive permission to amend the complaint to assert this cause of action against it.  Dkt. #174, p.2.  The defendants are correct that plaintiff did not receive permission to assert these claims against them. Dkt. #80, Exh. D, ¶¶ 167-182.   Accordingly, it is recommended that Schofield Oil's motion (Dkt. #162), for summary judgment be **GRANTED** with respect to the sixth and seventh causes of action and that Speedy Oil's motion (Dkt. #173), be **GRANTED** with respect to the sixth cause of action.

<u>Lonsdale Schofield, Joseph Chalhoub & 118958 Canada's</u>
<u>Motion for Summary Judgment</u>

Lonsdale Schofield, Joseph Chalhoub, and 118958 Canada argue that
they cannot be liable under New York's Debtor & Creditor Law because they are not
alleged to have been either a transferee of the assets at issue or a beneficiary of the
allegedly fraudulent conveyance.  Dkt. #163, pp.12-14; Dkt. #174, p.14.

"The New York Court of Appeals has made clear that the pertinent
provisions of the New York Debtor & Creditor Law provide a creditor's remedy for
money damages against parties who participate in the fraudulent transfer of a debtor's
property and are transferees of the assets and beneficiaries of the conveyance."
*Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir.), *cert. denied*,
510 U.S. 945 (1993), *citing Federal Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 841-42
(1990); *see RTC Mortgage Trust v. Sopher*, 171 F. Supp.2d 192, 201 (S.D.N.Y. 2001)
("Under New York law, a creditor may recover money damages against parties who
participate in the fraudulent transfer and are either transferees of the assets or
beneficiaries of the conveyance." ).

Plaintiff responds that the defendants benefitted from the fraudulent
transfers, thereby creating personal liability for the funds diverted from the contingency
fund.  Dkt. #190, pp.30-32.  However, the Court finds that there is no evidence
submitted to suggest that Lonsdale Schofield, Joseph Chalhoub or 118958 Canada
benefitted from the transfers and loans to Ahsen Yelkin, EC Holdings or Katherine

Street Properties.  Moreover, there is no evidence submitted to suggest that the transfer to George Booth, III, benefitted these defendants.  As a result, it is recommended that the motions of Lonsdale Schofield (Dkt. #162), Joseph Chalhoub (Dkt. ##173 & 179), and 118958 Canada (Dkt. ##173 & 179), for summary judgment be **GRANTED** with respect to the sixth and seventh causes of action against them.

<u>Ahsen Yelkin & EC Holdings' Motion for Summary Judgment</u>

Ahsen Yelkin and EC Holdings argue that plaintiff's claims against them under New York's Debtor & Creditor Law are barred by the statute of limitations.  Dkt. #206, pp.5-6.

Section 276 of New York's Debtor & Creditor Law is governed by a six-year statute of limitations commencing from the date of the fraudulent conveyance or two years from the date the fraudulent conveyance is or should have been discovered, whichever is later.  Plaintiff alleges that it did not know of the improper transfers prior to December 20, 1999 and did not become aware of the scheme to defraud the environmental creditors and of the culpability of the proposed defendants until Ahsen Yelkin excused himself from his deposition on May 25, 2001 when confronted with a promissory note and thereafter, upon receipt of documents produced by Joseph Chalhoub and Breslube Industries sometime subsequent to October 2, 2001.  Dkt. #78, ¶¶ 77-79; Dkt. #189, ¶ 25.  The action is deemed to have been commenced as of the date plaintiff filed its motion to amend the complaint.  *Rothman v. Gregor*, 220 F.3d 81,

96 (2d Cir. 2000).  Since the proposed amended complaint was filed on December 20, 2001, which is within two years of the earliest potential claim of alleged discovery, it is recommended that the motion (Dkt. #183), for summary judgment by Ahsen Yelkin and EC Holdings seeking dismissal of the sixth cause of action against them on the basis that it is barred by the statute of limitations be **DENIED**.

## Eighth Cause of Action - Breach of Fiduciary Duty

The amended complaint alleges that George Booth, III, Lonsdale Schofield, and Joseph Chalhoub breached their fiduciary duty to preserve Booth Oil's assets for the environmental creditors.  Dkt. #129, ¶¶ 190-194.

Lonsdale Schofield & Joseph Chalhoub's Motion to Dismiss

Lonsdale Schofield and Joseph Chalhoub argue that plaintiff lacks standing to assert this claim against them because plaintiff is no more than a general creditor.  Dkt. #163, p.18; Dkt. #174, p.20.  "Whether considered as asserting a claim under common law or under New York State General Business Law § 720," defendants argue that the eighth cause of action must be dismissed.  Dkt. #163, p.18.

"Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of creditors."  *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp.2d 290, 308 (S.D.N.Y. 2006); *see Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981), *cert. denied*, 455 U.S. 990 (1982).

As a result, plaintiff, as a creditor, has standing to assert this claim against Booth Oil's officers and directors.  *See Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp.2d 290, 308 (S.D.N.Y. 2006).   Accordingly, it is recommended that the motions of Lonsdale Schofield (Dkt. #162), and Joseph Chalhoub (Dkt. ##173 & 179), to dismiss this cause of action against them be **DENIED** since they were directors of Booth Oil during the time period in question.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the aforesaid motions be resolved as follows:

### Lonsdale Schofield

**GRANT** Lonsdale Schofield's motion (Dkt. #162), to dismiss the first cause of action (CERCLA), without prejudice;

**DENY** Lonsdale Schofield's motion (Dkt. #162), to dismiss the fourth cause of action (enforcement of Booth Oil's Liquidating Plan);

**GRANT** Lonsdale Schofield's motion (Dkt. #162), to dismiss the sixth cause of action (New York Debtor & Creditor Law § 276);

**GRANT** Lonsdale Schofield's motion (Dkt. #162), to dismiss the seventh cause of action (New York Debtor & Creditor Law § 273); and

**DENY** Lonsdale Schofield's motion (Dkt. #162), to dismiss the eighth cause of action (breach of fiduciary duty).

**Schofield Oil**

**GRANT** Schofield Oil's motion (Dkt. #162), to dismiss the first cause of action (CERCLA), without prejudice;

**GRANT** Schofield Oil's motion (Dkt. #162), to dismiss the fourth cause of action (enforcement of Booth Oil's Liquidating Plan), without prejudice on the ground that it is not properly before the court;

**GRANT** Schofield Oil's motion (Dkt. #162), to dismiss the sixth cause of action (New York Debtor & Creditor Law § 276), without prejudice on the ground that it is not properly before the court; and

**GRANT** Schofield Oil's motion (Dkt. #162), to dismiss the seventh cause of action (New York Debtor & Creditor Law § 273), without prejudice on the ground that it is not properly before the court.   As it is recommended that each of the causes of action asserted against Schofield Oil be dismissed, it is also recommended that Schofield Oil be terminated as a defendant in this action.

**Booth Oil**

**DENY** Booth Oil's motion (Dkt. #165), for partial summary judgment dismissing the fifth cause of action (accounting).

**Joseph Chalhoub**

**DENY** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the first cause of action (CERCLA);

**DENY** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the second & third causes of action (Navigation Law liability);

**DENY** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the fourth cause of action (enforcement of Booth Oil's Liquidating Plan);

**GRANT** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the sixth cause of action (New York Debtor & Creditor Law § 276);

**GRANT** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the seventh cause of action (New York Debtor & Creditor Law § 273); and

**DENY** Joseph Chalhoub's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the eighth cause of action (breach of fiduciary duty).

**Breslube Industries**

**DENY** Breslube Industries' motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the first cause of action (CERCLA); and

**DENY** Breslube Industries' motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the second & third causes of action (New York Navigation Law).

**118958 Canada**

**GRANT** 118958 Canada's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the fourth cause of action (enforcement of Booth Oil's Liquidating Plan), without prejudice on the ground that it is not properly before the court;

**GRANT** 118958 Canada's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the sixth cause of action (New York Debtor & Creditor Law § 276); and

**GRANT** 118958 Canada's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the seventh cause of action (New York Debtor & Creditor Law § 273).  As it is recommended that each of the causes of action asserted against 118958 Canada be dismissed, it is also recommended that 118958 Canada be terminated as a defendant in this action.

**Speedy Oil**

**DENY** Speedy Oil's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the first cause of action (CERCLA);

**GRANT** Speedy Oil's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the fourth cause of action (enforcement of Booth Oil's Liquidating Plan), without prejudice on the ground that it is not properly before the court;

**GRANT** Speedy Oil's motion (Dkt. ##173 & 179), to dismiss and/or for summary judgment on the sixth cause of action (New York Debtor & Creditor Law § 276), without prejudice on the ground that it is not properly before the court.

**Plaintiff**

**GRANT** plaintiff's motion (Dkt. #175), for summary judgment against Booth Oil on the first cause of action (CERCLA liability);

**GRANT** plaintiff's motion (Dkt. #175), for summary judgment against Booth Oil on the second & third causes of action (Navigation Law liability);

**DENY** plaintiff's motion (Dkt. #175), for judgment in the amount of $1,475,000.00, as a matter of law, against Booth Oil as damages on the environmental claims;

**GRANT** plaintiff's motion (Dkt. #175), for a declaration that Booth Oil's transfer of $450,000 to EC Holdings violated the terms of the Liquidating Plan;

**GRANT** plaintiff's motion (Dkt. #175), for a declaration that Booth Oil's transfer of $300,000 to Katherine Street Properties on August 15, 1994 violated the terms of the Liquidating Plan;

**GRANT** plaintiff's motion (Dkt. #175), for a declaration that Booth Oil's transfer of $275,000 to George Booth, III on October 7, 1994 violated the terms of the Liquidating Plan;

**DENY** plaintiff's motion (Dkt. #189), for summary judgment against George Booth, III, Joseph Chalhoub, Lonsdale Schofield, EC Holdings, Ahsen Yelkin, and Katherine Street Properties with respect to the fourth cause of action (enforcement of Booth Oil's Liquidating Plan); and

**GRANT** plaintiff's motion (Dkt. #175), for summary judgment with respect to the fifth cause of action against Booth Oil (accounting).

**Ahsen Yelkin**

**DENY** Ahsen Yelkin's motion (Dkt. #183), to dismiss and/or for summary judgment on the first cause of action (CERCLA);

**DENY** Ahsen Yelkin's motion (Dkt. #183), to dismiss and/or for summary judgment on the second & third causes of action (Navigation Law liability);

**GRANT** Ahsen Yelkin's motion (Dkt. #183), to dismiss and/or for summary judgment on the fourth cause of action (enforcement of Booth Oil's Liquidating Plan); and

**DENY** Ahsen Yelkin's motion (Dkt. #183), to dismiss and/or for summary judgment on the sixth cause of action (New York Debtor & Creditor Law § 276).

**EC Holdings**

**GRANT** EC Holdings' motion (Dkt. #183), to dismiss and/or for summary judgment on the fourth cause of action (enforcement of Booth Oil's Liquidating Plan);

**DENY** EC Holdings' motion (Dkt. #183), to dismiss and/or for summary judgment on the  sixth cause of action (New York Debtor & Creditor Law § 276).

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order</u>.  *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  <u>Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to counsel for the parties.


**SO ORDERED.**


DATED:      Buffalo, New York
            June 29, 2007

                                        **s/ H. Kenneth Schroeder, Jr.**
                                        **H. KENNETH SCHROEDER, JR.**
                                        **United States Magistrate Judge**